McGEE, Chief Judge.
*198 Appeal by Respondent-Mother ("Mother") from adjudication and disposition orders, adjudicating C.B. neglected and S.B. neglected and dependent, and continuing custody of S.B. with DSS. We affirm.
I. Procedural Background
C.B. and S.B. are twin sisters and were ten years old when the Buncombe County Department of Social Services ("DSS") filed the juvenile petitions in the present case. The petitions alleged that C.B. was a neglected juvenile and that S.B. was a neglected and dependent juvenile. The trial court entered an order awarding nonsecure custody of S.B. to DSS on 27 May 2014. The trial court held an adjudication hearing *199 ("the hearing") on 18 December 2014 and entered orders on 13 February 2015 adjudicating C.B. as a neglected juvenile and S.B. as a neglected and dependent juvenile. The trial court held a disposition hearing on 12 February 2015 and entered orders on 26 March 2015 continuing custody of C.B. with her mother under the supervision of DSS and continuing custody of S.B. with DSS. Mother appeals.
II. Factual Challenges
A. Standard of Review
Appellate review of an adjudication order is limited to determining "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." In re Pittman, 149 N.C.App. 756, 763-64, 561 S.E.2d 560, 566 (2002) (citation and quotation marks omitted). If the appellate court makes these determinations in the affirmative, it must uphold the trial court's decision, "even where some evidence supports contrary findings." Id. at 764, 561 S.E.2d at 566. "It is not the role of this Court to substitute its judgment for that of the trial court." Scott v. Scott, 157 N.C.App. 382, 388, 579 S.E.2d 431, 435 (2003). Unchallenged findings are binding on appeal. In re C.B., 180 N.C.App. 221, 223, 636 S.E.2d 336, 337 (2006), aff'd, 361 N.C. 345, 643 S.E.2d 587 (2007). Moreover, "erroneous findings unnecessary to the determination do not constitute reversible error" where an adjudication is supported by sufficient additional findings *209 grounded in clear and convincing evidence. In re T.M., 180 N.C.App. 539, 547, 638 S.E.2d 236, 240 (2006).
B. Unchallenged Findings
Mother brings numerous challenges to the findings of fact in the adjudication orders as to C.B. and S.B. The following unchallenged findings of fact are pertinent to an understanding of Mother's arguments on appeal:[1]
13. On [15 March] 2014, [DSS] received a report that alleged the following: that [Mother] slaps [S.B.] and calls her degrading names. The report further alleged that [S.B.] has extreme behavior problems, including punching herself.
...
*200 15. The report was screened in and assigned to social worker ... Amanda Wallace [ ("Ms. Wallace") ].
...
18. [Ms.] Wallace testified that [S.B.] had been hospitalized at Copestone [psychiatric hospital] on five (5) occasions, as specified below. [S.B.'s] therapist recommended intensive in-home services for [S.B.], upon discharge. [Mother] was aware of this recommendation but did not comply. [Mother] felt that [S.B.'s] issues could be handled at home and that all [S.B.] needed was "someone to talk to". On [17 March] 2014, [Mother] told [Ms.] Wallace that she had cancelled an appointment with Access Family Services, for an assessment for outpatient services for [S.B.], because she "didn't get a good vibe" from her conversation with the provider. [Mother] committed to finding another provider for these services, but ultimately failed to do so.
19. After the initial interview with [Mother], [DSS] received a new report that alleged that [S.B.] had a "blow up" at a local Ingles and was admitted to Copestone for evaluation. She was released from Copestone on [9 April] 2014, only to be readmitted later that day, after she ran from her mother, climbed up a tree, and refused to come down. The Asheville City Fire Department and Asheville City Police, responded and plucked [S.B.] from the tree, at which point she assaulted an Asheville City Police Officer by biting that officer. [S.B.] is ten years old.
...
21. On [21 April] 2014, [S.B.] was discharged from Copestone. However, immediately after she was discharged, [S.B.] had another outburst. She assaulted school staff and locked herself in a closet at school. After she was extracted from the closet, she was readmitted into Copestone. During this incident, [S.B.] reported that [Mother] was forcing her to take the wrong medication while at school.
...
*201 26. A treatment team meeting with the hospital staff and [social worker Craig] Flores [ ("Mr. Flores") ] was scheduled for Monday, [19 May] 2014. The team was developing a plan for [S.B.] to be discharged from the hospital and was exploring a more appropriate placement for [S.B.'s] discharge. [Mother] was aware of this meeting and had agreed to attend. However, [Mother] later refused to attend that meeting. At that time the discharge plan for [S.B.] was that she was to be released to a Psychiatric Residential Treatment Facility (PRTF) upon her release from Copestone.
27. After the treatment team meeting, [Mr.] Flores went to [Mother's] home to see why she did not attend the meeting. [Mother] stated that she would not cooperate with the hospital or [DSS] to develop a discharge plan. [Mother] stated that [S.B.] only had a fever. [Mother] also refused to sign *210 releases to allow [DSS] and the hospital to develop a discharge plan.
...
30. [Mr.] Flores testified that on [22 May] 2014, [Mother] stated to him that she had "taken care of everything"; that she would no longer work with [DSS]; that she would not sign releases to Copestone; that she would not enroll [S.B.] in a PRTF as recommended by [S.B.'s] discharge plan. [Mother] disclosed that she did not agree with the discharge plan and that she wanted [S.B.] to be grounded at home in order to reconnect with her family identity. [Mother] ultimately signed a referral to Eliada as a PRTF. However, this action was not in compliance with the discharge recommendation, in that the document signed was only a consent to place, and [Mother] knew that Eliada did not have a bed available for 30-40 days.
...
35. The Court further finds that [Mother] testified to behaviors that she and the minor children suffered in the housing project, which are supported by medical records; however, said records recommended that the minor children [should] be assessed, especially [S.B.], which [Mother] failed to do. Additionally, [Mother]
*202 was not in compliance with discharge orders for Copestone, and did not protect [C.B.] from [S.B.'s] behaviors. [Mother's] preferred treatment for [S.B.] to come home and be in the familial environment was directly in conflict with medical recommendations.
The trial court further found that C.B. and S.B. did "not receive proper care, supervision or discipline" from Mother and that they "live[d] in an environment injurious to [each girl's] welfare." It also found that Mother was "unable to provide for [S.B.'s] care or supervision and lack[ed] an appropriate alternative child care arrangement" for her.
C. Challenged Findings as to S.B.
Mother challenges numerous findings in the adjudication order as to S.B.[2] Finding of fact 16 in the adjudication order as to S.B. provides that
16. [Ms.] Wallace's investigation determined that [S.B.] has been hospitalized at Copestone several times, including four separate times during the investigation. [S.B.'s] behaviors are extremely negative and have directly limited her access to services. For example, [S.B.] is no longer allowed to ride the bus to school, and the local church bus refuses to allow her to ride.
Mother contends that "[t]he evidence [presented at the hearing showed] that [S.B.] refused to ride the bus and that this is why [Mother] had to take [S.B.] to school and pick her up in the afternoon." Ms. Wallace and Mother did testify at the hearing that S.B. did not want to ride the bus. However, Ms. Wallace also testified about an incident in which S.B. "ran away from [a] church bus and climbed up a tree, [and] that she had to be taken to the ER for evaluation." Ms. Wallace also testified that S.B. would run away from school, attack school personnel, and generally acted "uncontrollable." She confirmed that "those behaviors affected [S.B.'s] ability to ride the school bus [.]" Even assuming Mother's challenge regarding S.B. being "no longer allowed to ride the [school] bus" is *203 meritorious, the portion of finding of fact 16 that "[S.B.'s] behaviors are extremely negative and have directly limited her access to services" is supported by clear and convincing evidence. Mother does not challenge the remainder of finding of fact 16. Therefore, all but the last sentence in finding of fact 16 is binding on this Court. *211 C.B., 180 N.C.App. at 223, 636 S.E.2d at 337 ; Pittman, 149 N.C.App. at 764, 561 S.E.2d at 566.
Findings of fact 17, 22, and 33 in the adjudication order as to S.B. provide that
17. [Ms.] Wallace interviewed [Mother]. [Mother] denied calling [S.B.] names. [Mother] admitted that [S.B.] had been hospitalized several times due to [S.B.'s] behaviors. However, [Mother] minimized [S.B.'s] behaviors. She did agree to follow up with mental health services for [S.B.] However, [Mother] ultimately failed to cooperate with services recommended for [S.B.]
...
22. While [Mother] initially agreed to follow up with [S.B.'s] medical health needs, it became clear through subsequent interviews and actions that [Mother] minimizes [S.B.'s] behaviors and does not accept that [S.B.'s] behaviors are rooted in mental health problems. [Mother] also believes that the hospital "reprogrammed" [S.B.] to turn ... against [Mother].
...
33. After review of all the documentary evidence and the relevant testimony of the parties, the Court finds as fact the allegations in the Juvenile Petition and makes the following ultimate findings of fact. [S.B.] has been hospitalized due to psychiatric concerns no less than 5 times in 4 months, and she is engaging in behaviors requiring the intervention of mental health services. [S.B.] was in Copestone in March of 2004[sic], and displaying aggressive, assaultive, dangerous behaviors, and [Mother] did make efforts to get [S.B.] medical treatment; however, [Mother] failed to grasp the severity of [S.B.'s] mental health issues, and failure to do so placed [S.B.] at risk.
Mother challenges only the statements in findings of fact 17, 22, and 33 suggesting Mother "minimize[d] [S.B.'s] behavior or fail[ed] to grasp the *204 severity of it." At the hearing, Ms. Wallace testified that S.B. (1) regularly attacked other people, including school personnel and a police officer; (2) ran away from home and school; and (3) had to be hospitalized at Copestone multiple times. Ms. Wallace further testified that, in her conversations with Mother, Mother (1) "didn't characterize [S.B.'s behaviors] as severe[;]" (2) demonstrated that she did "not understand[ ] the severity of [S.B.'s] mental health issues[;]" and (3) believed S.B.'s mental health issues could be addressed at home without any outside "intervention[.]" Mr. Flores also testified that Mother failed to demonstrate an understanding of the extent of S.B.'s mental health needs, was even confused as to "why Copestone[, a psychiatric hospital,] was keeping [S.B.] so long because [Mother believed S.B.] was only admitted ... for having a fever[,]" and that Mother's plan upon S.B.'s discharge was to merely "bring [S.B.] home[.]" Accordingly, the challenged statements in findings of fact 17, 22, and 33 are supported by clear and convincing evidence. Mother does not challenge the remainder of findings of fact 17, 22, and 33. Therefore, all of those findings are binding on this Court. C.B., 180 N.C.App. at 223, 636 S.E.2d at 337 ; Pittman, 149 N.C.App. at 764, 561 S.E.2d at 566.
Finding of fact 20 in the adjudication order as to S.B. provides that
20. [Ms.] Wallace's investigation determined that [C.B.] was present during the incident at Ingle's, specified above, and has been present during each incident that resulted in [S.B.] being involuntarily committed to Copestone. On this occasion, [C.B.] had to "run around Ingles" in an effort to find her sister, was worried about her, and expressed fear that [S.B.] was going to be hurt as a result of [S.B.'s] behaviors. [Mother] failed to protect [C.B.] from [S.B.'s] behaviors, and [Mother's] solution was that everyone "just needed to step out", and allow [Mother] to get [S.B.] grounded at home.
Mother challenges only the statement in finding of fact 20 that Mother "failed to protect [C.B.] from [S.B.'s] behaviors" during the incident at Ingles because, Mother contends, *212 she was not present during the incident and, therefore, was unable to "protect" C.B. at that time. Although we believe Mother likely takes too narrow a view of what the trial court meant when it found that Mother "failed to protect [C.B.] from [S.B.'s] behaviors," even assuming Mother's challenge is meritorious, the remaining, unchallenged, portion of this finding is binding on this Court. C.B., 180 N.C.App. at 223, 636 S.E.2d at 337. *205 Findings of fact 23, 31, 32 and 34 in the adjudication order as to S.B. provide
23. [Mother] refused to allow Intensive In Home Services to work with her family. [Mother] admitted to [Ms.] Wallace that she believes [S.B.'s] behaviors are making her and [S.B.'s] sister put their lives on hold. [Mother] is extremely defensive and rejects outside intervention into her family, despite the fact that [S.B.] remains hospitalized due to her extreme behaviors. [Mother] is unwilling or unable to understand [S.B.'s] needs, and refuses to make changes in her life to address [S.B.'s] needs. [Mother] does not have any emotional protective capacity and agitates [S.B.], making the situation more out of control.
...
31. [Mr.] Flores testified that [Mother] stated many times her belief that [S.B.] suffered from seizures and that was the only reason that [S.B.] was hospitalized. [S.B.] was tested at Copestone for seizures and no seizure disorder was identified. [Mr.] Flores was able to find no medical record that supported the conclusion that [S.B.] suffered from [a] seizure disorder. [Mother] never asked [DSS] to secure a second medical opinion on this issue. Despite all of the information to the contrary, [Mother] continues to believe that [S.B.] suffers from [a] seizure disorder, rather than from mental health issues.
32. [Mother] testified that she had signed all treatment plans for [S.B.], prior to [13 May] 2014, but that she believed that [DSS's] treatment plans caused [S.B.] to have seizures, and that these treatment plans endangered her daughter. [Mother] believes that [S.B.] suffers from Post-Traumatic Stress Disorder (PTSD), due to a bullying incident that occurred at the family's housing project, but that this issue could be handled by her at home. [Mother] acknowledged that [C.B.] was present during the incidents of [S.B.'s] behaviors specified above, but had no concerns about exposing [C.B.] to [S.B.'s] behaviors.
...
*206 34. The Court finds that [Mother] testified that [S.B.'s] only problems were a fever and a seizure, which is not evidenced in the Copestone records. Treatment medical doctors had acknowledged that [Mother's] presence with [S.B.] makes [S.B.'s] behaviors worse, and doctors felt there was a nexus between [Mother] and [S.B.'s] worsening behaviors. The doctors felt a PRTF placement was necessary to cut this connection. Throughout this case [DSS] has worked diligently with [Mother] to meet the needs of [S.B.] [Mother] refused intensive in-home treatment. [Mother] did sign some initial papers for Eliada, but not a release for [S.B.] to be placed there. [Mother] did state she and [C.B.] were being held hostage by [S.B.'s] behaviors, and [C.B.] was exposed to [S.B.'s] behaviors. [Mother] took no protective steps to keep [C.B.] from being exposed to [S.B.'s] behaviors, and when [Mother] was offered an opportunity to have [C.B.] evaluated, she refused.
Mother contends that the statements in findings of fact 23 and 34 suggesting that Mother would not agree to intensive in-home services for S.B. are not supported by the evidence. Ms. Wallace testified at the hearing that Mother consistently refused to let S.B. receive intensive in-home services and instead insisted that S.B. be cared for by Mother or receive less-intense, periodic outpatient services, which Ms. Wallace testified did not "effectively treat [S.B.'s] mental health *213 needs[,]" lasted only two weeks, and ended when S.B. was readmitted to Copestone. Ms. Wallace further testified that, instead of Mother disagreeing with the potential efficacy of intensive in-home services for S.B., Mother stated she refused to let S.B. receive intensive in-home services because she did not want providers "coming to" her home and because Mother "thought she could handle [S.B.'s mental health needs] at home" by herself. Moreover, although Mother contends in her brief that she "was willing" to have S.B. receive intensive in-home services by the time medical personnel felt S.B. needed placement in a psychiatric residential treatment facility ("PRTF"), we find no evidence from the adjudication hearing to support this contention. Therefore, the challenged statements in findings of fact 23 and 34 are supported by clear and convincing evidence.
Mother also contends that statements in findings of fact 31, 32, and 34 suggesting that Mother believed S.B.'s behaviors were the result of fevers and seizures are not supported by the evidence. However, Mr. Flores testified Mother conveyed to him "her belief that [S.B.'s] only *207 real issue was having a seizure disorder[.]" Mother even testified that S.B. was admitted to Copestone only "because [S.B] had a fever and her eyes rolled back in her head and she passed out and had an episode." Therefore, the challenged statements in findings of fact 31, 32, and 34 are supported by clear and convincing evidence. Mother also does not contest the trial court's finding that medical personnel at Copestone could find no evidence that S.B. suffered from seizures.
With regards the adjudications of S.B. as neglected and dependent, the challenged statements in findings of fact 23, 31, 32 and 34 are supported by clear and convincing evidence; Mother does not challenge the remainder of findings of fact 23, 31, 32 and 34.[3] Therefore, they are binding on this Court. C.B., 180 N.C.App. at 223, 636 S.E.2d at 337 ; Pittman, 149 N.C.App. at 764, 561 S.E.2d at 566.
Findings of fact 24 and 25 in the adjudication order as to S.B. provide that
24. On [15 May] 2014, the case was substantiated and transferred to In Home [social worker Mr.] Flores. [Mr.] Flores met with [Mother] on [15 May] 2014. [Mother] refused to agree to any services, [and she] refused to follow up with any mental health services for [S.B.] [Mother] also refused to participate in a comprehensive clinical assessment, as she found that "offensive." [Mother] did acknowledge that [Mr.] Flores had a "calming energy" and stated she would allow him to conduct home visits.
25. [S.B.] was hospitalized in Copestone after being admitted on [14 May] 2014. [S.B.] has serious mental health needs that [Mother] refuses to ensure that those needs are met. [Mother] refuses to sign any releases or work with the hospital to plan for [S.B.'s] discharge. [S.B.] does not want to return to [Mother's] home.
Mother contends that the statements in findings of fact 24 and 25 suggesting that Mother "refused to participate in any services and would not agree to work with the hospital on a discharge plan" are not supported by the evidence. As a preliminary matter, findings of fact 26 and 27, which are not challenged by Mother, establish that Mother "would not *208 cooperate with the hospital or [DSS] to develop a discharge plan" and in fact "refused to sign releases to allow [DSS] and the hospital to develop [any] discharge plan." See C.B., 180 N.C.App. at 223, 636 S.E.2d at 337. Moreover, Mr. Flores testified at the hearing that Mother did, in fact, refuse to participate in S.B.'s discharge planning because "she wasn't in agreement with ... the doctor's recommend[ed]" treatment plan, which-absent DSS filing the present action-could have resulted in S.B. continuing to reside at Copestone psychiatric hospital indefinitely.[4] *214 Accordingly, the challenged statements in findings of fact 24 and 25 are supported by clear and convincing evidence. Mother does not challenge the remainder of findings of fact 24 and 25. Therefore, they are binding on this Court. C.B., 180 N.C.App. at 223, 636 S.E.2d at 337 ; Pittman, 149 N.C.App. at 764, 561 S.E.2d at 566.
1. S.B.'s Neglect Adjudication
Mother first challenges the trial court's adjudication of S.B. as neglected. A neglected juvenile is defined, in part, as one "who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare [.]" N.C. Gen.Stat. § 7B-101(15) (2013). "[T]his Court require[s] [that] there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment" as a consequence of the alleged neglect. In re McLean, 135 N.C.App. 387, 390, 521 S.E.2d 121, 123 (1999) (citations, quotation marks, and emphasis in original omitted).
Findings of fact 16, 23, and 25, and finding of fact 18, which is not challenged by Mother, show that S.B. had to be committed to Copestone five times in only four months, that S.B. "has serious mental health needs[, and] that [Mother] refuses to ensure that those needs are met." Findings of fact 17, 22, 23, 31, 32, and 34, and finding of fact 27, which is not challenged by Mother, show that, although Mother "initially agreed to follow up with [S.B.'s] medical health needs, it became clear through subsequent interviews and actions that [Mother] minimize[d] [S.B.'s] behaviors and [did] not accept that [S.B.'s] behaviors are rooted in mental health problems." Findings of fact 31, 32, and 34, and finding of fact 27, which is not challenged by Mother, specifically show that Mother *209 believed S.B.'s extreme and violent behavior was the result of fevers or seizures. Findings of fact 17, 22, and 23 also establish that Mother was "unwilling or unable to understand [S.B.'s] needs, ... refuse [d] to make changes in her life to address [S.B.'s] needs[,] ... does not have any emotional protective capacity[,] and agitates [S.B.], making the situation more out of control." Furthermore, findings of fact 16 and 20, and findings of fact 19 and 21, which are not challenged by Mother, show that S.B. continued to have erratic and violent behavior while in Mother's custody and while she was not receiving meaningful mental health services. Yet, findings of fact 20 and 23, and findings of fact 18, 30, and 35, which are not challenged by Mother, show that Mother's "preferred treatment for [S.B. was for S.B.] to come home and be in the familial environment[, which] was directly in conflict with medical recommendations." Findings of fact 24 and 25, and findings of fact 26 and 27, which are not challenged by Mother, show that Mother refused to " cooperate with the hospital or [DSS] to develop a discharge plan" for S.B. during a subsequent hospitalization at Copestone and "refused to sign releases to allow [DSS] and the hospital to develop a discharge plan."
The binding facts, discussed above, support the trial court's ultimate conclusion that S.B. was neglected. Contrary to Mother's contention in her brief, the present case was not brought merely because "[M]other and the hospital [had a disagreement] concerning the next step in [S.B.'s] treatment." Instead, the binding findings of the trial court establish that (1) while S.B. was in Mother's custody, Mother continuously failed to obtain meaningful mental health services for S.B. that could have prevented or mitigated S.B.'s need for repeated hospitalizations at Copestone; (2) greatly minimized and denied the seriousness of S.B.'s condition; and (3) even exacerbated it. Mother also obstructed the creation of any discharge plan for S.B. while S.B. was hospitalized at Copestone, and thereby continued to subject S.B. to "the most intensive and restrictive type of [mental health] facility" in the state, 10a N.C.A.C. 27g.6001, even though all of the evidence presented at the hearing indicated that such continued placement would not have been medically "appropriate[.]"
This Court is sensitive to the difficult and momentous decisions that parents of children with severe mental illness must face. Indeed, *215 we agree with the dissent that it likely would be inappropriate for the State to utilize neglect proceedings to resolve disagreements between parents and doctors over equally appropriate treatment options. We further agree with the dissent that parents have a "fundamental right ... to make decisions concerning the care, custody, and control of their children," but respectfully note that this right is protected only "so long as a parent *210 adequately cares for his or her children [.]" Troxel v. Granville, 530 U.S. 57, 66-68, 120 S.Ct. 2054, 2061, 147 L.Ed.2d 49, 57-58 (2000) ; accord Petersen v. Rogers, 337 N.C. 397, 402, 445 S.E.2d 901, 904 (1994) ("[S]o long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves."). "A parent's rights with respect to [his or] her child[ren] have thus never been regarded as absolute, but rather are limited [,] ... critically, [by] the child[rens'] own complementary interest in preserving ... [their] welfare and protection [.]" Troxel, 530 U.S. at 88, 120 S.Ct. at 2072, 147 L.Ed.2d at 70 (Stevens, J., dissenting).
Indeed, our Courts have long held that constitutional "protection of the parent's interest is not absolute [and] ... 'the rights of the parents are a counterpart of the responsibilities they have assumed.' " Price v. Howard, 346 N.C. 68, 76, 484 S.E.2d 528, 533 (1997) (quoting Lehr v. Robertson, 463 U.S. 248, 257, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614, 624 (1983) ). "[T]he constitutionally-protected paramount right of parents to custody, care, and control of their children" does not extend to "neglect[ing] the welfare of their children[.]" Petersen, 337 N.C. at 403-04, 445 S.E.2d at 905. At some point, a parent's unjustified unwillingness or inability to obtain meaningful medical care for her child who is experiencing serious illness rises to the level of neglect, and that is something the Constitution and the laws of this state will not protect. See N.C.G.S. 7B-101(15) (specifically defining a neglected juvenile as one "who does not receive proper care ... from the juvenile's parent, ... or who is not provided necessary medical care; ... or who lives in an environment injurious to the juvenile's welfare[.]"); accord In re A.R., 227 N.C.App. 518, 520, 742 S.E.2d 629, 631 (2013) (finding neglect, in part, where a child had "serious health issues including cysts on his only kidney and an enlarged bladder" and the parents repeatedly failed to obtain appropriate medical care for those conditions); cf. In re Huff, 140 N.C.App. 288, 300, 536 S.E.2d 838, 846 (2000) (holding that questions of "medical neglect" are "appropriate considerations" in an action to terminate parental rights, even though "[s]uch findings ... infring[e] on the [constitutionally-protected] autonomy of the parents to some degree[.]").
In the present case, the findings of the trial court that are binding on appeal support the trial court's ultimate conclusion that S.B. was neglected. They establish that Mother continuously failed to obtain meaningful mental health services for S.B. while S.B. was in Mother's custody, minimized and denied the seriousness of S.B.'s condition, and even exacerbated it. This placed S.B. at a substantial risk of some physical, mental, or emotional impairment. See *211 McLean, 135 N.C.App. at 390, 521 S.E.2d at 123. Accordingly, we affirm the trial court's adjudication of S.B. as neglected.
2. S.B.'s Dependency Adjudication
Mother next challenges the trial court's adjudication of S.B. as dependent. She contends that the findings of fact and evidence do not support the trial court's conclusion of law that S.B. was a dependent juvenile. Specifically, she argues that the findings of fact "reflect [only a] disagreement between ... [M]other and the hospital concerning the next step in [S.B.'s] treatment."
A juvenile may be adjudicated dependent when the juvenile's parent, guardian or custodian "is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen.Stat. § 7B-101(9) (2013). When determining that a child is dependent "[u]nder this definition, the trial court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements." In re P.M., 169 N.C.App. 423, 427, 610 S.E.2d 403, 406 (2005). "Findings *216 of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in reversal of the [trial] court." In re B.M., 183 N.C.App. 84, 90, 643 S.E.2d 644, 648 (2007). However, it has been "consistently held that in order for a parent to have an appropriate alternative child care arrangement, the parent must have taken some action to identify viable alternatives." In re L.H., 210 N.C.App. 355, 364, 708 S.E.2d 191, 197 (2011).
In the present case, the trial court made the ultimate finding that Mother was "unable to provide for [S.B.'s] care or supervision and lack[ed] an appropriate alternative child care arrangement." The unchallenged and otherwise binding findings of fact, discussed above, show that Mother continuously failed to obtain meaningful mental health services for S.B. while S.B. was in Mother's custody. Mother also failed to identify any "viable" placement alternatives outside of placement in her home at the adjudication hearing.[5] See id. Although Mother argues in her brief that she "was never given a chance to suggest an appropriate alternative child care arrangement" for S.B., the findings of the trial court clearly establish that Mother refused to participate in, and even obstructed, S.B.'s discharge planning. Accordingly, we affirm the trial court's adjudication of S.B. as dependent.
*212 D. Challenged Findings as to C.B.'s Neglect Adjudication
Mother challenges the trial court's adjudication of C.B. as neglected. She contends that the findings of fact and evidence do not support the trial court's conclusion of law that C.B. was a neglected juvenile. Specifically, she argues that the trial court adjudicated C.B. a neglected juvenile "just because ... Mother would not agree to a comprehensive clinical assessment of [C.B.] and [because C.B.] saw some of S.B.'s extreme behaviors." (capitalization modified without brackets).
As already discussed, a juvenile is neglected if the juvenile lives in an environment injurious to the juvenile's welfare or that poses a "substantial risk" to the juvenile's wellbeing. McLean, 135 N.C.App. at 390, 521 S.E.2d at 123 ; see N.C.G.S. 7B-101(15). "In determining whether a juvenile is a neglected juvenile, it [also] is relevant whether that juvenile lives in a home where another juvenile has been subjected to ... neglect[.]" Id.
In addition to the factual challenges, discussed above, Mother specifically challenges part of finding of fact 32 in the adjudication order as to C.B., stating that Mother "had no concerns about exposing [C.B.] to [S.B.'s] behaviors[,]" and argues that this finding "was not a fair reflection of the evidence." However, during the adjudication hearing, Ms. Wallace testified that Mother acknowledged she and C.B. were "held hostage" by S.B.'s behaviors and that they "couldn't live their lives because they had to be on guard with [S.B.]" Finding of fact 20 shows that C.B. had been "present during each incident that resulted in [S.B.] being involuntarily committed to Copestone." This finding also recounts an incident where C.B. "had to 'run around [an] Ingles' [while S.B. was having a 'blow up'] in an effort to find her sister, was worried about her, and expressed fear that [S.B.] was going to be hurt as a result of [S.B.'s] behaviors[.]" According to Ms. Wallace, C.B. was exposed to numerous similar incidents that made C.B. feel "scared" and alone. Many of these incidents involved acts of violence by S.B. Yet, Mother was unwilling or unable to obtain meaningful mental health services for S.B. while S.B. was at home with her and C.B., thereby continuing to expose C.B. to S.B.'s behaviors unabated. Moreover, Mother testified at the adjudication hearing that she was "waiting for [the issues with S.B.] to be over" before seeking any kind of therapy or help for C.B. and that, generally, she "was not concerned for" C.B.'s wellbeing as a result of S.B.'s "fits[.]" Accordingly, there was sufficient clear and convincing evidence presented at the adjudication hearing to support the contested portion *217 of finding of fact 32 that Mother "had no concerns about exposing [C.B.] to *213 [S.B.'s] behaviors." Therefore, this finding is binding on appeal. See C.B., 180 N.C.App. at 223, 636 S.E.2d at 337 ; Pittman, 149 N.C.App. at 764, 561 S.E.2d at 566.
Mother may be correct that "the sibling of [a] child with mental health issues will be exposed to things that a parent wishes the sibling did not have to experience" and that it would pose an "impossible standard" to "expect a parent to anticipate when and where the problems will arise[.]" Again, this Court is sensitive to the innumerable challenges that parents of children with severe mental illness must face, especially when siblings are involved. However, in the present case, and notwithstanding whether Mother was willing to have C.B. undergo a comprehensive clinical assessment, all of the unchallenged or otherwise binding findings of the trial court support the trial court's ultimate conclusion that C.B. was neglected. Mother (1) allowed C.B. to be continually exposed to S.B.'s erratic, troubling, and violent behavior; (2) failed to obtain meaningful medical services for S.B. while S.B. was in her custody that could have mitigated that behavior; and (3) showed no concern for the effect this might have on C.B. Accordingly, we affirm the trial court's adjudication of C.B. as neglected.
III. Mother's Claim of Ineffective Assistance of Counsel
Mother's final contention is that she received ineffective assistance of counsel "because her attorney did not review [S.B.'s] medical records" from Copestone or subpoena the hospital psychiatrist and social worker during the adjudication hearing. (capitalization modified without brackets).
"[D]ecisions such as which witnesses to call, [or] whether and how to conduct examinations ... are strategic and tactical decisions that are within the exclusive province of the attorney. Trial counsel are necessarily given wide latitude in these matters." State v. Rhue, 150 N.C.App. 280, 290, 563 S.E.2d 72, 79 (2002) (citation and quotation marks omitted). To prevail upon a claim that counsel's assistance was ineffective, a parent must show that: (1) counsel's performance was deficient and (2) the deficient performance was so serious as to deprive the parent of a fair hearing. In re S.N.W., 204 N.C.App. 556, 559, 698 S.E.2d 76, 78 (2010). The client must show that "counsel's conduct fell below an objective standard of reasonableness ... [and that had] counsel [not] made [the alleged] error [in question], even [if it was] an unreasonable error, ... there is a reasonable probability ... there would have been a different result in the proceedings." State v. Braswell, 312 N.C. 553, 561-63, 324 S.E.2d 241, 248 (1985). "[T]he burden to show that counsel's *214 performance fell short of the required standard is a heavy one for [the client] to bear." State v. Fletcher, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001).
Mother has not carried that burden. As a preliminary matter, Mother acknowledges in her brief that S.B.'s medical records from Copestone were entered into evidence and that the trial court reviewed S.B.'s medical records in camera for about two hours.[6] Mother does take issue with DSS's characterization of S.B. during the adjudication hearing as having "severe mental health issues," and she contends the medical records would have shown that S.B.'s extreme behavior emanated instead from "psychosocial [issues,] ... caused by the relationship with her mother." Assuming Mother is correct, this would seem to hurt, rather than help, Mother's position that S.B. was not living in an environment injurious to her welfare while in Mother's custody.
Mother also contends that the medical records would have informed Mother's testimony and helped explain the hospital's reasoning behind its actions and treatment decisions. However, this does not get at the heart of the allegations pertaining to S.B. in her neglect and dependency petition-that S.B. was at risk because Mother was unwilling or unable to ensure that S.B. received medically necessary mental health services. Accordingly, we are unable to say "there is a reasonable probability ... there would have been a different result in the proceedings" had counsel fully reviewed and elicited testimony *218 on the contents of S.B.'s medical records at the adjudication hearing. Braswell, 312 N.C. at 563, 324 S.E.2d at 248.
Moreover, even assuming arguendo that counsel's performance was deficient as Mother claims, and that it "fell below an objective standard of reasonableness" as defined by Braswell, 312 N.C. at 561-62, 324 S.E.2d at 248, DSS presented "overwhelming" evidence to support the adjudications of S.B., and Mother does not contend that counsel's representation was otherwise not "vigorous and zealous." See In re Dj.L., 184 N.C.App. 76, 86, 646 S.E.2d 134, 141 (2007) (finding no ineffective assistance of counsel where, (1) assuming arguendo, "counsel failed to make proper objections to testimony [during a termination of parental rights hearing;] ... failed to develop defenses to the grounds alleged for termination; and ... did not subpoena witnesses" the parent felt were important to her case; (2) "DSS presented overwhelming evidence to support at *215 least one ground for termination of respondent's parental rights[;]" and (3) "[c]ounsel's representation, while not perfect, was vigorous and zealous."). Accordingly, Mother was not deprived of a fair hearing, see id., and the adjudication orders of the trial court are affirmed. Mother does not directly challenge the disposition orders on appeal.
AFFIRMED.
Judge STEPHENS concurs.
Judge TYSON dissents with separate opinion.

The findings of fact in each child's order are virtually identical. All quoted findings herein are taken from the adjudication order as to S.B.

Mother challenges finding of fact 12, which provides that "[t]he verified Juvenile Petition[s] [were] entered into evidence without objection by any party." Mother contends only that "[t]he record does not show that the petition[s] [were] entered into evidence." Although there were general references to documents being admitted into evidence at the hearings, we agree with Mother to the extent that it is not clear whether the verified petitions as to S.B. and C.B. were admitted into evidence at the hearing. However, Mother provides no further argument on this issue and, therefore, we do not believe it is conclusive as to her appeal.

However, Mother does challenge another part of finding of fact 32 with regard to C.B.'s neglect adjudication, discussed infra.

Psychiatric hospitals are "the most intensive and restrictive type of [mental health] facility" in the state. 10a N.C.A.C. 27g.6001.

Mother testified at the adjudication hearing that she was also willing to place S.B. in a PRTF called Eliada, but according to testimony from Mr. Flores, Eliada would not have had an opening for S.B. for "[a]t least 30 to 40 days[.]"

S.B.'s medical records from Copestone have been included in the record on appeal.