IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-1016

Filed: 1 May 2018

Henderson County, No. 11 CvS 890

TOKISHA M. INGRAM, Plaintiff,

v.

HENDERSON COUNTY HOSPITAL CORPORATION, INC., d/b/a MARGARET R.
PARDEE MEMORIAL HOSPITAL, RYAN CHRISTOPHER DAVIS, M.D., ROBERT
C. BOLEMAN, M.D., HENDERSONVILLE EMERGENCY CONSULTANTS, PC,
AMY K. RAMSAK, M.D., and TST MEDICAL, PA., Defendant.

Appeal by plaintiff from order entered on or about 10 October 2014 by Judge

Martin B. McGee and judgment entered on or about 24 February 2016 by Judge Mark

E. Powell in Superior Court, Henderson County. Heard in the Court of Appeals 25

May 2017.

*Ferguson Chambers & Sumter, P.A., by James E. Ferguson, II, for plaintiff-appellant.*

*Roberts & Stevens, P.A., by Ann-Patton Hornthal and Phillip T. Jackson, for defendant-appellees Henderson County Hospital Corporation, Inc. d/b/a Margaret R. Pardee Memorial Hospital.*

*Van Winkle, Buck, Wall, Starnes and Davis, P.A., by Emma J. Hodson, for defendant-appellees Ryan Christopher Davis, M.D., Robert C. Boleman, M.D., and Hendersonville Emergency Consultants, PC.*

*Northup McConnell & Sizemore, PLLC, by Isaac N. Northup, Jr., for defendant-appellees, Amy K. Ramsak, M.D. and TST Medical, PA.*

STROUD, Judge.

Plaintiff sued defendants for medical malpractice arising out of the care they provided to her for sepsis. A jury ultimately found all defendants not liable. On appeal, plaintiff contends the trial court erred in several evidentiary rulings and in dismissing her claim arising out of nursing care against defendant Henderson County Hospital Corporation, Inc., d/b/a Margaret R. Pardee Memorial Hospital. After careful review, we affirm.

Many witnesses testified regarding plaintiff's illness, the medical care she received, and the standards of care for the diagnosis and treatment of her condition. This overview of plaintiff's medical care omits many details and is based primarily upon plaintiff's medical records and the testimony of Dr. David P. Milzman, plaintiff's expert witness, who provided the initial summary of the facts to the jury. Defendants disputed the interpretation and meaning of some facts, but for purposes of the issues on appeal, we need not summarize defendants' evidence and contentions.

## I. Factual Background

The factual background of plaintiff's case took place over 23 and 24 February 2010.

### A. 23 February 2010

Plaintiff, then age 35, went to the emergency room at defendant Henderson County Hospital Corporation, Inc., d/b/a Margaret R. Pardee Memorial Hospital ("Pardee Hospital") on 23 February 2010 at about 9:17 p.m. Plaintiff reported that

she had severe pain in her back right side, which she described as at a level of 10 out of 10.  Plaintiff also had a fever, nausea, vomiting, fatigue, and shortness of breath. Hospital employees took plaintiff's blood pressure and temperature; plaintiff's heart rate was 103 and her blood pressure was 135/83.

Within about five minutes, plaintiff was seen by defendant Ryan Christopher Davis, M.D.  Defendant Davis evaluated plaintiff and noted that she had abdominal cramps, vomiting, and body aches; he noted her pain was mild, even though she had identified her pain as level 10 out of 10 to a nurse a few minutes earlier.  Defendant Davis did not note that plaintiff's pain was on her right side and noted no prior surgeries, although plaintiff "had had her tubes tied."  Defendant Davis did a physical examination of plaintiff and noted that plaintiff had tenderness but no "guarding and rebound" which would indicate a "really severe abdominal exam." Defendant Davis did not perform a pelvic examination; he did order two laboratory tests, one to check her urine and "basic chemistries" which shows "kidney function and . . . basic electrolytes, sodium, potassium chloride, serum bicarbonate and sugar." Defendant Davis prescribed, and plaintiff received, Toradol, an intravenous ("IV") pain medication; Zofran, for vomiting; and IV fluids.

By about 10:30 p.m., plaintiff's blood pressure was a little lower but her heart rate was still 103; plaintiff reported her pain as 7 out of 10.  Defendant Davis received plaintiff's lab test results showing her creatinine was slightly elevated and her urine

showed a trace of blood and "a little bit of sugar," and white blood cells. These results usually mean "you are fighting a bacterial infection" and indeed plaintiff's urine also had "a few bacteria." Defendant Davis returned to see plaintiff and reexamined her, noting that she felt better. Defendant Davis gave plaintiff an oral antibiotic, Levaquin 500 milligrams, and Vicodin for pain. Defendant Davis diagnosed plaintiff with vomiting and a urinary tract infection. Defendant Davis gave plaintiff prescriptions for Cipro, an oral antibiotic, and Vicodin for pain. Defendant Davis discharged plaintiff by 11:04 p.m.

Plaintiff's expert witness, Dr. Milzman, testified that Defendant Davis "got a lab result" but "ignored the signs and symptoms" plaintiff reported. Specifically, plaintiff did not report "the most common thing in a urine infection," burning while urinating nor did she report frequent urination, urgency, or pain in her bladder. Dr. Milzman further testified that if part of plaintiff's issue was dehydration from vomiting, plaintiff's heart rate should have dropped some after receiving the IV fluid, but it did not. Plaintiff was still in pain, and "[p]ain that bad, that's not a urine infection."

Dr. Milzman opined that Defendant Davis should have kept plaintiff in the hospital until he could get plaintiff's heart rate under 100 and get better pain relief. Dr. Milzman also testified that Defendant Davis needed to determine why plaintiff's right side was hurting so much by performing an ultrasound or a CAT scan. In

addition, Defendant Davis should have "done a blood count" which may have indicated a high white blood cell count as based on the tests done, the elevated creatinine level could indicate kidney injury. Dr. Milzman ultimately testified that Defendant Davis failed to provide proper care by failing to "recognize the initial and progressive severity" of plaintiff's condition, failing "to properly evaluate changing values in her condition, including a heart rate and her pain complaint," failing to give her IV antibiotics which would generally get "around faster to the body," failing to examine her properly on her right side pain, and failing to improve her condition before she was discharged.

B.     24 February 2010

The next day, 24 February 2010, plaintiff returned to Pardee Hospital ER at about 3:36 p.m.[1] A nurse noted plaintiff had a urinary tract infection and hypotension/tachycardia; hypotension is low blood pressure, and tachycardia is a high heart rate. The nurse noted plaintiff as a priority level 2 patient, which is one level higher than she was assigned the night before, but instead of having a physician see plaintiff, hospital personnel sent her to the "walk-in side" of the ER where she was seen by a physician assistant; this would indicate that they believed her condition to

---

[1] The trial court allowed a defense motion to preclude "testimony from Ms. Ingram, the plaintiff in this case, about her recollection of presenting to the emergency department on the *morning* of February 24th[.]" (Emphasis added.) But despite this ruling, plaintiff was allowed to testify that she had come to the ER in the morning, but was told to return "'home and give the medication time to work.'" There was no medical record of the visit.

be "less emergent."  Plaintiff's temperature was 97; her heart rate was 100, and her blood pressure was 99/51 – "a significant drop" from the night before; her pain level was still 10 out of 10.  Mr. Ursin, a physician assistant, saw plaintiff at about 4:30 p.m.  Mr. Ursin noted plaintiff's treatment from the night before and that plaintiff had an appointment with her doctor the next day.  Plaintiff reported that she was still nauseated and vomiting and had vomited up her medication; she also felt dehydrated.  Mr. Ursin noted plaintiff had body aches and chills.

Although it had been about an hour since plaintiff's blood pressure had been checked, Mr. Ursin did not recheck it nor did he note any problems from her physical exam.  Mr. Ursin ordered 500 cc of IV fluid, some morphine, Toradol for pain (although he did not chart the pain), an IV antibiotic, and Zofran.  Dr. Milzman noted that 500 cc of fluid would not be enough to raise plaintiff's blood pressure, giving plaintiff morphine could cause her blood pressure to drop, and Toradol could harm her kidneys; again, plaintiff's creatinine levels from the night before indicated she may have kidney injury.  Mr. Ursin also ordered labs.  A little more than an hour later, plaintiff's lab results came back showing her creatinine had gone up indicating "her kidney function is much worse . . . . [F]or the first time we have a blood count, and it's low. . . . . [A] low blood count goes along with being severely infected in some patients."

About 6:00 p.m., a nurse went to check on plaintiff and could not get a blood pressure reading and could only feel a faint pulse; her blood pressure was 60 palpable, meaning she was in shock and did not have "enough blood pressure to adequately perfuse the body." Mr. Ursin directed that the remainder of the 500 cc of fluid be administered, but he did not direct any other care or consult a physician. Defendant Robert C. Boleman was on duty at the time.

At 6:50 p.m., plaintiff's blood pressure was even lower, 50/25. Mr. Ursin first consulted defendant Amy K. Ramsak, M.D. At about 7:56 p.m., defendant Boleman first saw plaintiff. Defendant Boleman ordered more antibiotics and started dopamine, a medication to help raise blood pressure. At this point, plaintiff started to receive critical care. Over the next hour, plaintiff received additional medication to raise her blood pressure, fluid, and antibiotics. At 9:01 p.m., defendant Ramsak who had previously provided other orders by phone, ordered a lactate level; the result was 5.6, which is "very high" and placed plaintiff at "50 percent, probably closer to 60 percent mortality at that time." By 11:00 p.m., plaintiff was given a breathing tube and placed on a ventilator; hospital personnel continued to work on resuscitating plaintiff through that night and into the next morning. Plaintiff had progressed from shock to septic shock; Dr. Milzman described this progression:

> [W]e have different criteria that we use for describing an infectious syndrome which takes into account any two of up to seventeen combinations of heart rate and temperature and white blood cell count and respiratory effort

measurement. And so that's called what we call SIRS or systemic inflammatory response syndrome, which is basically an infectious series of information that we use to identify people at big risk. So you can have an infection.

We talked about sepsis, when now the infection has created changes in the body's response. So not just a sore throat, a strep throat, but a -- maybe high fever and high heart rate, that will get you sepsis. . . .

. . . .

. . . So if you want to think of it as a spectrum . . . . there's regular infection and then what we calls SIRS, which is systemic inflammatory response syndrome. And then there's sepsis, a source of infection plus these criteria. So that's sepsis.

And then there's severe sepsis which is you have the infection with all of these markers, plus the body is starting to fail. Either one or two organ systems start to fail. Like the kidneys start to fail. Like with Ms. Ingram, unfortunately. I told you her creatinine, which is a marker for kidney injury, is starting to go up. Later on she has trouble breathing, can't breathe on her own. They have to put a breathing tube in, put her on a ventilator which happens at 11:00 p.m. that night. So the body -- different organ systems in the body, the lungs, now are starting to fail.

. . . .

And you go from severe sepsis with a mortality rate of anywhere between 20 and 40, depending who you read, to septic shock, where now you have a mortality of 50 to 70 percent.

Dr. Milzman testified that Mr. Ursin did not provide adequate care because he did not make his supervising physician aware of plaintiff's 60 palp blood pressure when this was first discovered about 6:00 p.m., and he did not consult with the ICU and ask that plaintiff be admitted. Dr. Milzman also testified that defendants had missed the opportunities to intervene the night before or much earlier on 24 February

after plaintiff returned to the ER. "[I]f you can intervene and prevent the patient from going into shock, you have a much better chance at survival."

C.     Treatment at Mission Hospital

The next day, 25 February 2010, plaintiff was transferred to another hospital, Mission St. Joseph's Hospital in Asheville, because she needed "dialysis to get off the excess fluid."[2]  Plaintiff was hospitalized for over a month.  Upon discharge from Mission Hospital,

> [i]t was noted in the records that a tampon was left in her at the time of catheterization and it was not immediately discovered. She had many diagnoses including severe systemic inflammatory response syndrome, suggestive of overwhelming sepsis. She had extensive finger and toe necrosis and skin sloughing with necrosis on both calves. Her fingers were eventually surgically removed and she is to have her toes removed in the near future. She was discharged from Mission Hospital on March 29, 2010.

Plaintiff had additional medical treatment after her discharge from the hospital and eventually lost all of her fingers and both legs below the knee.

## II.     Procedural Background

Plaintiff filed a complaint against defendants in May of 2011, alleging that each defendant was negligent in providing care and this resulted in her devastating injuries.  Defendants all filed answers, denying the substantive allegations. Defendants also filed various motions, but for purposes of this appeal, we will not

---

[2] Plaintiff did not bring any claims against Mission Hospital.

discuss them all. In March of 2013, defendant Pardee Hospital moved to dismiss "[p]laintiff's complaint to the extent the complaint alleges or asserts that said Defendant is liable for the negligence of any health care provider except for Defendants Ryan Christopher Davis, M.D. and Robert C. Boleman, M.D., the health care providers that Plaintiff's 9(j) expert identified as being negligent." In October of 2014, the trial court allowed the motion and dismissed plaintiff's claims against defendant Pardee Hospital "to the extent the Complaint asserts a claim for negligence based upon the theory that the nursing staff of Defendant County Hospital Corporation, Inc., d/b/a/ Margaret R. Pardee Memorial Hospital failed to comply with the applicable standard of care."

The jury was impaneled on 29 January 2016, and the jury entered its verdict on 23 February 2016. The jury ultimately determined plaintiff had not been "injured by the negligence" of any defendant. In February of 2016, the trial court entered judgment determining plaintiff should "recover nothing" and her action was dismissed with prejudice. Plaintiff appeals both the October 2014 order and the February 2016 judgment.

### III. Medical Malpractice Claims

In *Smith v. Whitmer*, this Court summarized the elements of a medical malpractice claim and how the plaintiff must prove those elements:

> In a medical malpractice claim, a plaintiff must show (1) the applicable standard of care; (2) a breach of

such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff. Section 90–21.12 of the North Carolina General Statutes prescribes the appropriate standard of care in a medical malpractice action:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

Because questions regarding the standard of care for health care professionals ordinarily require highly specialized knowledge, the plaintiff must establish the relevant standard of care through expert testimony. Further, the standard of care must be established by other practitioners in the particular field of practice of the defendant health care provider or by other expert witnesses equally familiar and competent to testify as to that limited field of practice.

Although it is not necessary for the witness testifying as to the standard of care to have actually practiced in the same community as the defendant, the witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care of similar communities. The same or similar community requirement was specifically adopted to avoid the imposition of a national or regional standard of care for health care providers.

159 N.C. App. 192, 195–96, 582 S.E.2d 669, 671–72 (2003) (citations and quotation marks omitted).

## IV.    Admission of Clinical Studies

Plaintiff first contends the trial court erred in allowing admission "into evidence, through defense questioning, of testimony by experts regarding three studies published four to five years after the events giving rise to plaintiff's claims[.]" (Original in all caps.)[3]  Plaintiff contends the three studies "erroneously addressed the standard of care[,]" "the patients in the study were not comparable to plaintiff[,]" "the outcomes in the studies were irrelevant[,]" "the purpose of the studies was irrelevant[,]" and "the probative value of the testimony was substantially outweighed by its prejudicial effect[.]"  (Original in all caps.)

A.    Preservation of Objection

---

[3]  Evidence about the three studies came before the jury through testimony, and thus plaintiff is not challenging the admission of the three studies themselves but rather the testimony regarding them.  But the trial court considered the three studies themselves for purposes of ruling on plaintiff's evidentiary objections, so we will consider this issue based upon the same information.

Defendants contend plaintiff failed to preserve her objection to the admission of evidence regarding the three studies -- ProCESS,[4] ProMISE,[5] and ARISE[6] (collectively "three studies") -- and has waived review on appeal because plaintiff also presented evidence related to the three studies on direct examination in questioning her own expert witness. Defendants agree they first mentioned and introduced evidence regarding the studies and also that plaintiff made a continuing objection which the trial court allowed. But defendants argue that despite the valid continuing objection, plaintiff later waived that objection when her counsel asked questions regarding the studies on direct examination. According to defendants' argument, plaintiff could not ask questions on direct examination regarding the three studies without waiving her objection.

Although defendants' argument focuses on a few lines of the transcript, we have reviewed all of the relevant testimony and full context of plaintiff's questioning regarding the three studies. Once the trial court had allowed the evidence regarding

---

[4] The ProCESS Investigators, A Randomized Trial of Protocol-Based Care for Early Septic Shock, The New England Journal of Medicine 370;18, p. 1683, May 1, 2014 ("ProCESS").

[5] Paul R. Mouncey, M.Sc., Tiffany M. Osborn, M.D., G. Sarah Power, M.Sc., David A. Harrison, Ph.D., M. Zia Sadique, Ph.D., Richard D. Grieve, Ph.D., Rahi Jahan, B.A., Sheila E. Harvey, Ph.D., Derek Bell, M.D., Julian F. Bion, M.D., Timothy J. Coats, M.D., Mervyn Singer, M.D., J. Duncan Young, D.M., and Kathryn M. Rowan, Ph.D. for the ProMISE Trial Investigators, Trial of Early, Goal-Directed Resuscitation for Septic Shock, The New England Journal of Medicine, March 17, 2015 ("ProMISE").

[6] The ARISE Investigators and the ANZICS Clinical Trials Group, Goal-Directed Resuscitation for Patients with Early Septic Shock, The New England Journal of Medicine, October 9, 2014 ("ARISE").

the three studies over plaintiff's objection, she was not required to avoid mention of the studies but was permitted to attempt to limit or avoid any prejudice from the evidence without losing the benefit of the continuing objection:

> The well established rule that when incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost, but, as stated by *Brogden, J.*, in *Shelton v. Southern R. Co.*, 193 N.C. 670, 139 S.E. 232, 235: The rule does not mean that the adverse party may not, on cross-examination, explain the evidence or destroy its probative value, *or even contradict it with other evidence upon peril of losing the benefit of his exception.*

*State v. Godwin*, 224 N.C. 846, 847–48, 32 S.E.2d 609, 610 (1945) (emphasis added) (quotation marks omitted).

Plaintiff's questioning regarding the three studies pointed out their limitations and differences and were intended to demonstrate her contention that they were not relevant to her case. Since the trial court allowed the evidence over her objection, plaintiff could attempt to "contradict" the studies with her witnesses' testimonies. *See id.* Because plaintiff properly preserved her continuing objection, her later questioning on direct examination of her witnesses regarding the three studies did not waive her objection.

B.    EGDT and the Three Studies

During the trial, several medical studies were discussed. Plaintiff contended that she should have received early goal-directed treatment ("EGDT") and

defendants countered with other studies. The EGDT protocol was described in an article published in 2001 in which Dr. Emanuel Rivers was the principal investigator ("Rivers study").[7] Dr. Rivers compared the outcomes in two groups of patients presenting with sepsis; this trial was done at a single hospital and enrolled 263 patients.[8] Rivers study at 1368. The control group was the "standard-therapy group" which was "treated at the clinicians' discretion according to a protocol for hemodynamic support . . . with critical-care consultation, and were admitted for inpatient care as soon as possible." *Id.* at 1370 (footnote omitted). The other group received the EGDT protocol. *See id.*

One of plaintiff's expert witnesses,[9] Dr. Daniel Snider, explained EGDT and the results of the Rivers study in his testimony. All of the patients presented with sepsis, and one group received the EGDT protocol -- "from the beginning, starts IV fluid, starts antibiotics, aggressive IV fluids" -- and the other group received the

---

[7] Emanuel Rivers, M.D., M.P.H., Bryant Nguyen, M.D., Suzanne Havstad, M.A., Julie Ressler, B.S., Alexandria Muzzin, B.S., Bernhard Knoblich, M.D., Edward Peterson, Ph.D., and Michael Tomlanovich, M.D. for the Early Goal-Directed Therapy Collaborative Group, Early Goal-Directed Therapy in the Treatment of Severe Sepsis and Septic Shock, The New England Journal of Medicine, 345;19, p. 1368, November 8, 2001 ("Rivers study").

[8] "Twenty-seven patients did not complete the initial six-hour study period (14 assigned to the standard therapy and 13 assigned to early goal-directed therapy)[.]" Rivers study at 1371.

[9] The trial court allowed Dr. Snider "to testify as an expert in these fields" and seemed to be referring to the fields of internal medicine and emergency medicine. But the trial court went on to state, "[h]owever, in regard to the standard of care, I will not allow him to testify to the standard of care in regard to the emergency room physicians or emergency department physicians, except to the extent that they had some duty to report to someone else when certain symptoms or certain things were observed in regard to the plaintiff." Plaintiff contests this determination by the trial court, and we address that issue in a later section.

"standard therapy" at that time.  Dr. Snider testified that Dr. Rivers

> found that the patients that he had enrolled in his protocol which I called Early -- he identified them as soon as he saw SIRS, which is basically vital signs and a white blood cell count if he needs it -- Goal-Directed -- he had these goals, he wanted to get fluids in the patient a fast as he could. That was a goal.  He wanted to maintain a blood pressure with pressors, dopamine or Levophed which is a brand name for norepinephrine which is a precursor to adrenaline.  Probably more than you need know. Goal-Directed, by trying to achieve these goals, good blood pressure, good fluid resuscitation, antibiotics, those are all worthy goals in a septic patient -- Therapy.  So that's EGDT that we've been hearing over and over.
>
> What did he find in the treatment of the early goal-directed therapy?  He found that in six hours they had a lower heart rate, they had a higher blood pressure. That's significant. Blood pressure is where it's at. You want that blood pressure high. Because a low blood pressure, shock in the worst case, means you are not getting oxygen to the tissue, the tissue is dying, your lactate acid is going up, your kidneys are failing, your brain is starting to shut down, you're becoming lethargic or worse, comatose, your breathing is not functioning, you have to go on a ventilator. All bad things. But he found that the blood pressure was coming up at six hours in the treatment group that got the goal-directed therapy, early goal-directed therapy.
>
> So what else did he find? Well, ultimately following these patients out further he found that 46 percent survived from septic shock versus 30 percent in the treatment arm that did not get early goal-directed therapy. 46 percent versus 30.  That's for every seven patients that would have died, one of those patients actually survived, they got to go home and with be their family. So it was a big deal saving one life that you would have lost out of every seven.
>
> So what happened next? Well, this was published in the *New England Journal of Medicine*. It's pretty prestigious, no matter what you've heard. I've certainly

> never been published in the New England Journal, and I
> would love to be. It's – the world took notice. Okay? In 2004
> an international committee made up of doctors from all
> over the world, Germany, Latin America, Japan, United
> States of course, of all kinds of doctors, critical care doctors,
> emergency medicine doctors, surgeons, infectious disease
> doctors, all of these committees and doctors and countries
> got together and they came up with guidelines, much of
> what was based on Dr. Rivers' studies, *Guidelines For the
> Treatment of Sepsis*. And it was published in, I'm sure – I'm
> quite confident, more than one journal because it was just
> so far-reaching.
>
> And those guidelines recommended certain things.
> They recommended rapid fluids. They recommended
> antibiotics. They recommended all of this within six hours.
> They even recommended things that -- that Dr. Rivers had
> found would be helpful but have since found to be maybe
> not as helpful as he thought. But they recommended that
> in 2004. And by 2010 those were still the guidelines
> internationally.

The Rivers study noted that its "primary efficacy end point" was "[i]n-hospital mortality[,]" and secondary end points were "resuscitation end points, organ-dysfunction scores, coagulation-related variables, administered treatments, and the consumption of health care resources." *Id.* at 1370. The Rivers study concluded that EGDT

> provided at the earliest stages of severe sepsis and septic
> shock, though accounting for only a brief period in
> comparison with the overall hospital stay, has significant
> short-term and long-term benefits. These benefits arise
> from the early identification of patients at high risk for
> cardiovascular collapse and from early therapeutic
> intervention to restore a balance between oxygen delivery
> and oxygen demand.

*Id.* at 1376.

Defendants' witnesses presented evidence regarding the three studies, which plaintiff contends are not relevant. All three studies compared the EGDT protocol to other standard treatment; all note some controversy regarding the efficacy of the EGDT protocol. As described by the ProCESS study, the Rivers study was "[i]n a single-center study published more than a decade ago" which involved "patients presenting to the emergency department with severe sepsis and septic shock" which found that

> mortality was markedly lower among those who were treated according to a 6-hour protocol of early goal-directed therapy (EGDT), in which intravenous fluids, vasopressors, inotropes, and blood transfusions were adjusted to reach central hemodynamic targets, than among those receiving usual care. We conducted a trial to determine whether these findings were generalizable and whether all aspects of the protocol were necessary.

ProCESS at 1683.

The ProCESS study was done from 2008 to 2013 in 31 United States emergency departments with 1,341 patients enrolled. *See id.* at 1683, 1686. ProCESS considered differences in 90 day mortality, 1-year mortality, and "the need for organ support." *Id.* at 1683, 1685. The ProCESS study ultimately concluded that "protocol-based resuscitation of patients in whom septic shock was diagnosed in the emergency department did not improve outcomes." *Id.* at 1683.

The ProMISE trial was conducted in 56 hospitals in England from 2011 to

2014, with 1,260 patients enrolled. ProMISE at 1, 3. ProMISE concludes that "[i]n patients with septic shock who were identified early and received intravenous antibiotics and adequate fluid resuscitation, hemodynamic management according to a strict EGDT protocol did not lead to an improvement in outcome." *Id.* at 1.

The ARISE study tested "the hypothesis that EGDT, as compared with usual care, would decrease 90-day all-cause mortality among patients presenting to the emergency department with early septic shock in diverse health care settings." ARISE at 2. The ARISE trial was conducted from 2008 until 2014 at 51 hospitals in several countries, most in Australia or New Zealand, with 1,600 patients enrolled. *See id.* at 1-2. The ARISE study noted,

> EGDT was subsequently incorporated into the 6-hour resuscitation bundle of the Surviving Sepsis Campaign guidelines, and a number of nonrandomized studies showed a survival benefit with bundle-based care that included EGDT. Despite such successes, considerable controversy has surrounded the role of EGDT in the treatment of patients with severe sepsis. Concerns have included the potential risks associated with individual elements of the protocol, uncertainty about the external validity of the original trial, and the infrastructure and resource requirements for implementing EGDT.

*Id.* at 2 (footnotes omitted). ARISE concluded that "the results of our trial show that EGDT, as compared with usual resuscitation practice, did not decrease mortality among patients presenting to the emergency department with early septic shock." *Id.* at 10.

As noted in the summary of plaintiff's care, her evidence showed first that her diagnosis of sepsis was delayed, and second, she did not receive EGDT. Generally, plaintiff's evidence showed that her condition was not correctly diagnosed on 23 February, her diagnosis was delayed on 24 February, and her initial treatment on both days she came to the hospital was much less aggressive than treatment by EGDT. Plaintiff contended to the jury that if she had been promptly diagnosed with sepsis and received EGDT, her outcome would have been improved and she would not have suffered serious and permanent injuries, including amputations.

C.     Relevance of Studies and Prejudicial Effect

Plaintiff argues that the three studies are not relevant for several reasons. Plaintiff contends that the three studies "erroneously addressed the standard of care" and considered "mortality, not morbidity." Plaintiff also argues that the purposes and outcomes of the three studies were not relevant because the study patients were not similar to or in the same circumstances as plaintiff. Plaintiff's fifth argument is that even if the studies are relevant "the probative value of the testimony was substantially outweighed by its prejudicial effect[.]"

> [Under Rule 401 e]vidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. . . . Although the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great

deference on appeal. Because the trial court is better situated to evaluate whether a particular piece of evidence tends to make the existence of a fact of consequence more or less probable, the appropriate standard of review for a trial court's ruling on relevancy pursuant to Rule 401 is not as deferential as the abuse of discretion standard which applies to rulings made pursuant to Rule 403.

*Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (citations and quotation marks omitted).

1. Timing of the Three Studies

The primary basis for plaintiff's objection, as noted in her motion in limine and during argument of the motions, was her contention the three studies are not relevant to the issues in dispute because they were published in 2014 and 2015 and could not have been a consideration in determining the standard of care for treatment of sepsis in 2010. In other words, plaintiff contends the three studies are not relevant to the issues in dispute because they were published *after* her hospitalization:

> These studies that they are talking about came up in 2014, four years after Ms. Ingram had lost her fingers and her legs and her feet. And what they are trying to do -- we have a motion to prevent them from bringing this study in, because it doesn't inform anything about what happened to Ms. Ingram in 2010. And essentially what they are trying [to] do is to change in 2014 the standard of care in 2010. That's what these studies are about.[10]

---

[10] In addition, plaintiff contended that even if they were relevant to some extent, they were unfairly prejudicial due to the risk of misleading or confusing the jury as to the standard of care in 2010; we will address this contention below in this opinion.

In this part of plaintiff's argument on why evidence regarding the three studies should not have been admitted plaintiff also contends

> [t]o the extent that the studies addressed the standard of care, either directly or indirectly, they were grossly misleading to the jury in that they suggested that the standard of care at the time the studies were published was the same as the standard of care in 2010 when Ms. Ingram was injured. . . . [T]he studies purport to address the issue of causation, by implication the studies address the standard of care by concluding that Early Goal Directed Therapy (EGDT), an element of the standard of care according to Plaintiff's experts, would have been of no benefit to . . . [plaintiff]. . . . In short, Defendants were saying by these studies that the standard of care didn't matter because Ms. Ingram would have had the same outcome if the standard of care had been followed.

Plaintiff is correct: "Defendants *were* saying by these studies that the standard of care didn't matter because Ms. Ingram would have had the same outcome if the standard of care had been followed." (Emphasis added). In other words, the three studies are relevant to show lack of causation no matter the timing, because they tend to show that the results from EGDT and "standard treatment" are about the same. *See generally* ProCESS, PROMISE, ARISE. The three studies have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Dunn*, 162 N.C. App. at 266, 591 S.E.2d at 17. This argument is overruled.

2.    Mortality versus Morbidity

Plaintiff next contends that the three studies were irrelevant because they were comparing "mortality, not morbidity." This assertion is simply not borne out by the three studies. Plaintiff argues "the studies shed no light on what likely would have happened to her if she had been diagnosed earlier and treated accordingly." Plaintiff's own expert testified that the three studies did not find any difference in mortality or *morbidity* between EGDT as compared to "another protocol[.]" Even though the primary focus of the studies may have been on mortality, all of the studies address both mortality and morbidity to some extent, as a consideration of morbidity is only even possible if patients survive and thus necessitates some consideration of mortality. This argument is overruled.

3.      Comparability of Patients in Studies

Plaintiff next argues "[t]he outcomes of the patients in the three studies offered by Defendants have no application to . . . [plaintiff] because the patients included in the studies were not comparable to" her. Plaintiff points out that

> [t]he health status of the patients varied from patient to patient and included a variety of patients, some of whom were older than Ms. Ingram, more advanced in sepsis than Ms. Ingram, younger than Ms. Ingram, and sicker than Ms. Ingram. There were no patients referenced in the studies who had come to the hospital under circumstances like Ms. Ingram[.]

It is probably true that no patient in any of the studies was exactly like plaintiff, but no two patients in any studies are exactly alike. According to plaintiff, the lack of

almost identical patients would make all medical studies of no use in determining how to best treat other patients. Plaintiff's contentions regarding the characteristics of the patients enrolled in each study do not change the relevance of the three studies but go only to the weight and credibility of the evidence. Every patient in each study was unique but the physicians conducting the studies determined that the patients met the enrollment criteria of the particular study. Naturally, there were differences in the design, endpoints, methodology, and enrollment criteria for each study. The expert witnesses addressed these details on both direct examination and cross examination. This argument is without merit.

4.     Prejudicial Effect

Last, plaintiff argues that even if the three studies had some relevance, the trial court should have excluded them under Rule 403 because they are misleading and unfairly prejudicial to plaintiff. Under Rule 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2015).

> In general, the exclusion of evidence under the Rule 403 balancing test is within the sound discretion of the trial court. Abuse of discretion occurs where the court's ruling is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision.

*State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133 (1993) (citations omitted).

Plaintiff argues the three studies were "dangerously misleading" because they have the "initial appearance of . . . addressing septic shock, which . . . [plaintiff] ultimately developed."  Again, plaintiff's argument of unfair prejudice is premised upon the fact that the patients in the three studies were not "comparable to" plaintiff:

> There is nothing in the studies to suggest that any of the patients were Ms. Ingram's age, had a similar or comparable medical history, were otherwise healthy upon their presentation to the hospital or were turned away from the hospital at the earliest stages of sepsis and returned to the hospital on two additional occasions before any therapy was started.

Plaintiff's focus on the characteristics and circumstances of each patient in a medical trial is misguided.  Again, by plaintiff's standard, there would be no medical study possible which could be admissible in a medical malpractice case; even the Rivers study cannot meet this standard.  Some studies may have patients who more closely resemble plaintiff or some may have more differences, but the expert medical testimony is necessary to evaluate the strengths and weaknesses of each study and determine which studies are most applicable for a particular situation.  The evidence here shows that the primary goal of each of the three studies was to determine the efficacy of the protocol for EGDT -- the very protocol plaintiff advocated as the standard of care for her treatment -- the three studies were relevant for this purpose, and again, plaintiff's arguments go to the weight and credibility of the three studies,

not unfair prejudice. The trial court did not abuse its discretion in ruling that the probative value of the three studies was not "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" N.C. Gen. Stat. § 8C-1, Rule 403.

In addition, based upon plaintiff's objection to use of the three studies to establish a standard of care, the trial court gave a limiting instruction as to the three studies: "Any medical literature published after February 23rd, 2010, cannot be considered for the purpose of establishing standard of care in this case. However, it may be used for other purposes in this case." Plaintiff argues this limiting instruction was not sufficient, since "advising the jury not to consider the studies on the issue of the standard of care, it is unrealistic to assume that jurors, in a complex case as this one was, would be able to appropriately apply the limitation." But we do not assume the jury failed to follow the instructions, despite the complexity of the case: "A jury is presumed to follow the court's instructions, and we must therefore presume that the jury based its verdict on these instructions." *Ridley v. Wendel*, ___ N.C. App. ___, ___, 795 S.E.2d 807, 813–14 (2016) (citation, quotation marks, and brackets omitted). This is argument is overruled.

V.    Preclusion of Dr. Snider's Testimony Regarding Standard of Care

Plaintiff next contends that

> the trial court erred in precluding plaintiff's expert, Dr.
> Daniel Snider, from testifying regarding the applicable

> standard of care for defendant emergency room physicians and physician assistant when plaintiff's expert was engaged in a similar practice which included patients with the same illnesses as plaintiff and the same treatment modalities and procedures as those applied to plaintiff and which gave rise to plaintiff's injuries.

We review the trial court's ruling excluding Dr. Snider's testimony as to standard of care for abuse of discretion:

> Rule 702 of the North Carolina Rules of Evidence governs the admissibility of expert testimony. It states:
>> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.
> Our courts construe this Rule to admit expert testimony when it will assist the factfinder in drawing certain inferences from facts, and the expert is better qualified than the factfinder to draw such inferences. A trial court is afforded wide latitude in applying Rule 702 and will be reversed only for an abuse of discretion.

*In re Hayden*, 96 N.C. App. 77, 82, 384 S.E.2d 558, 561 (1989) (citations, quotation marks, ellipses, and brackets omitted).

We have reviewed the testimony at trial at length. Even if the trial court erred by precluding a portion of Dr. Snider's expert testimony, plaintiff cannot demonstrate prejudice since ultimately Dr. Snider testified regarding his opinion of how plaintiff should have been tested when she arrived at the emergency department and of the diagnosis suggested by her symptoms:

Q.      Dr. Snider, given the presentation, including the complaints and findings of Ms. Ingram's condition on the night of February 23rd *when she was at the emergency department* at Pardee, what were those signs, symptoms indicative of in your opinion?

MR. CURRIDEN:   Objection, Your Honor.

THE COURT:      Overruled.

A.      *In my opinion I think she was presenting with early sepsis. And the only tests that we don't have to back that up is a complete blood count, a very simple test. A test that I want to know the results of when I see somebody with abdominal cramps, vomiting, generalized pain 10 of 10, shortness of breath, body aches.* I mean, that's – that's a constitutional whole body response, not something localized like a urinary tract infection, a simple urinary tract infection.
        The only way -- well, let me rephrase that. One of the easiest ways to determine if this is much more serious than what we see on the record here is to get a CBC, a blood count. I would imagine everybody on the jury has had a blood count at some point in their life.

MR. CURRIDEN:   Objection. Motion to strike, Your Honor.

THE COURT:      Overruled. The motion is denied.

A.      It provides basic information including a white blood cell count, which I mentioned is the body's way of fighting off infection. When you have infection, especially an infection that goes systemic, your white blood cell count would absolutely be expected to go up.

Q.      Now – I'm sorry, go ahead. Finish your answer then I have another question for you.

A.      We don't have a white count, a simple test. In my

opinion if we had had a white count that night, it would have demonstrated findings very suggestive or conclusive for sepsis much like the white count the following day did. And that would have cleared the air very quickly.

*This was not a simple UTI, and she needed to be admitted for IV antibiotics, IV fluids. If this had been done, I have to say in my opinion it would have overwhelmingly changed the outcome here.* Way more than likely than not, to use a legal term, Ms. Ingram would not have lost her fingers, not have lost her toes. I doubt much of what took place the following day would have ever happened if she had been admitted that night, received IV antibiotics and more aggressive IV fluid resuscitation. *That was a crucial point in this whole course of events for Tokisha Ingram. Not getting a CBC that night changed the course of history for her.*

(Emphasis added.)   Plaintiff cannot demonstrate that excluding testimony by Dr. Snider regarding the standard of care as to diagnosis of sepsis caused her any prejudice, considering the evidence permitted by the trial court.   Furthermore, plaintiff's other expert witnesses also testified regarding the standard of care.   This argument is overruled.

VI.   Rule 9(j) Dismissal of Nursing Care Claim

Plaintiff's complaint alleged negligence by hospital nursing staff for failing "to correctly triage" plaintiff and failing "to recognize the severity of . . . [plaintiff's] condition."   The complaint also alleged that "[t]he medical care in this case has been reviewed by persons who are reasonably expected to qualify as expert witnesses under Rule 702 of the Rules of Evidence and who are willing to testify that the defendants' care did not comply with applicable standards of care."   In Rule 9(j)

discovery responses, plaintiff identified Dr. Sixsmith as her "reviewing expert[,]" although the response did not specifically identify nursing care.

In March of 2014, defendant Pardee Hospital moved to dismiss plaintiff's claim regarding nursing care because plaintiff's expert witness on this issue, Dr. Diane Sixsmith, testified in her deposition she did not believe that the nursing care fell below the applicable standard of care. The trial court entered an order on 10 October 2014 dismissing plaintiff's claims against defendant Pardee Hospital "to the extent the Complaint asserts a claim for negligence based upon the theory that the nursing staff of Defendant County Hospital Corporation, Inc., d/b/a/ Margaret R. Pardee Memorial Hospital failed to comply with the applicable standard of care."

Plaintiff contends that the trial court erred by

> dismissing under Rule 9(j) the plaintiff's claim of negligence against the Hospital involving nursing care when a qualified expert reviewed the medical care pursuant to Rule 9(j) and concluded that the hospital care fell below the standard, but did not specify the particular ways in which the care fell below the standard.

(Original in all caps.)

North Carolina General Statute § 1A-1, Rule 9(j) provides in relevant part:

> Any complaint alleging medical malpractice by a health care provider pursuant to G.S. 90-21.11(2)a. in failing to comply with the applicable standard of care under G.S. 90-21.12 shall be dismissed unless:
> (1)    The pleading specifically asserts that the medical care and all medical records pertaining to the alleged negligence that are available to the plaintiff

after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care[.]

N.C. Gen. Stat. §1A-1, Rule 9(j) (2015).

Compliance with Rule 9(j) is a question of law, which we review *de novo*:

A plaintiff's compliance with Rule 9(j) requirements clearly presents a question of law to be decided by a court, not a jury. Because it is a question of law, this Court reviews a complaint's compliance with Rule 9(j) *de novo*. When ruling on a motion to dismiss pursuant to Rule 9(j), a court must consider the facts relevant to Rule 9(j) and apply the law to them. A complaint facially valid under Rule 9(j) may be dismissed if subsequent discovery establishes that the certification is not supported by the facts, at least to the extent that the exercise of reasonable diligence would have led the party to the understanding that its expectation was unreasonable. When a trial court determines a Rule 9(j) certification is not supported by the facts, the court must make written findings of fact to allow a reviewing appellate court to determine whether those findings are supported by competent evidence, whether the conclusions of law are supported by those findings, and, in turn, whether those conclusions support the trial court's ultimate determination.

*Estate of Wooden v. Hillcrest Convalescent Ctr.*, 222 N.C. App. 396, 403, 731 S.E.2d 500, 506 (2012) (citations, quotation marks, and brackets omitted).

The trial court's October 2014 order includes detailed findings of fact regarding plaintiff's negligence claims arising from nursing care, plaintiff's responses to discovery on this issue, and Dr. Sixsmith's deposition testimony; plaintiff's brief

challenges none of these findings of fact as unsupported by competent evidence, so they are binding upon this Court. *See In re C.B.*, ___ N.C. App. ___, ___, 783 S.E.2d 206, 208 (2016) ("Unchallenged findings are binding on appeal.")

Plaintiff argues her complaint complied with Rule 9(j) because

> [t]here is no question in this case that the Complaint specifically asserts that the medical care at issue in this case was reviewed by a person who was reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who was willing to testify that the medical care did not comply with the applicable standard of care.

Plaintiff contends that she reasonably expected Dr. Sixsmith, her identified expert, to testify regarding nursing care. The trial court's findings of fact quoted Dr. Sixsmith's deposition where she stated that she had not believed nor would she testify that the nursing care provided by defendant Pardee Hospital fell below the standard of care. "[I]t is also now well established that even when a complaint facially complies with Rule 9(j) by including a statement pursuant to Rule 9(j), if discovery subsequently establishes that the statement is not supported by the facts, then dismissal is likewise appropriate." *Ford v. McCain*, 192 N.C. App. 667, 672, 666 S.E.2d 153, 157 (2008).

Plaintiff further contends that even if Dr. Sixsmith was unwilling to testify

> Dr. David Milzman, Dr. Daniel Abbott and Dr. Daniel Snider were all willing to testify at trial that the nursing care fell below standard. Their willingness to testify was brought to the attention of the trial court before the trial

court dismissed the action against Defendant Pardee as to nursing care. The particulars of the criticisms held by each of these witnesses, all of whom testified at trial, were contained in their respective depositions.

But plaintiff failed to identify Dr. Milzman, Dr. Abbott, and Dr. Snider as experts who would offer opinions regarding nursing care in response to discovery. In addition, plaintiff has failed to direct us to any place in the 678 page record, five depositions, or 2,930 pages of trial transcript where we might find verification of plaintiff's assertion that other experts were identified regarding nursing care before the trial court's May 2014 hearing on this issue to testify regarding nursing care; plaintiff's argument section on this issue contains no specific reference to the evidence before us. Therefore, the trial court's unchallenged findings of fact support its conclusion of law that plaintiff's "claim for negligence based upon the theory that the nursing staff of" defendant Pardee Hospital did not comply with Rule 9(j) and should therefore be dismissed. This argument is overruled.

VII.   Exclusion of Evidence of Morning Visit to the Hospital

Last, plaintiff argues that the trial court erred in allowing defendant's motion in limine and thus "limiting and excluding testimony from plaintiff and plaintiff's witnesses regarding plaintiff's visit to defendant Pardee Hospital on the morning of 24 February 2010." (Original in all caps.)

> We review a trial court's rulings on motions *in limine* and on the admission of evidence for an abuse of discretion. This Court will find an abuse of discretion only

where a trial court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.

*State v. Hernendez*, 184 N.C. App. 344, 348, 646 S.E.2d 579, 582 (2007) (citations and quotation marks omitted).

Defendant Pardee Hospital filed a motion in limine seeking to prevent plaintiff from testifying about a visit to the hospital on the morning of 24 February 2010. According to the defendant's argument on the motion in limine[11], plaintiff testified in her deposition she returned to the hospital on the morning of 24 February 2010:

> Ms. Ingram recalled in her deposition, and there's no allegation about this in the complaint either, but during her deposition she said, "Well, I do remember coming to the hospital on the morning of the 24th." Her recollection or best timeframe was about 10:00 o'clock or 10:30 the morning of the 24th. And that she was basically taken back to a treatment room and then told -- she overheard someone say on the other side of the curtain or wall, quote, "she is just a popper."[12] And then someone, a nurse, who she describes as a nurse, came back into the room and told her "you just need to go home and give the medicine time to work." There's no medical records, there's no other evidence of any visit on the morning of the 24th.

Defendant then argued:

> Ms. Ingram's testimony is that she interacted with the nursing staff. And as we have established in the first motion in limine, which is that the Hospital nursing staff

---

[11] Plaintiff did not include her deposition in our record, so we will quote defendants' counsel's argument on this issue.

[12] According to plaintiff's brief, she understood the term "popper" "to mean that she was a pill popper and was seeking medication and treatment."

as a theory of liability cannot exist in light of the Court's order from October 2014 dismissing the complaint, and as plaintiff's counsel has already indicated the only issue they intend to submit to the jury as to the Hospital's liability is the issue of apparent agency for Boleman, Davis, Dr. Ramsak, and perhaps Ursin, understanding we left that issue open. This testimony about a visit on the morning the 24th has no relevance to any claim in the case and, therefore, should be excluded.

The trial court allowed the motion in limine, with a qualification that it may reconsider depending upon the evidence presented during the trial:

Well, I'm going to allow that motion. But if you believe the door was opened by that argument she wasn't as -- the evidence might tend to show she wasn't as sick as she claimed or something similar, then I will reconsider that then. And I think I would probably allow that. Although, most likely not the comment that was overheard about being a popper.

At trial, plaintiff testified about her return to the hospital on the morning of 24 February 2010:

A.      On the sheet it said that, at the bottom of the sheet, I remember it said something about if you had these symptoms to come back. And then I was feeling really bad, so I went back that morning to the hospital.

Q.      Okay. Did you get any treatment when you got back?

A.      No, sir.

MR. JACKSON:      Objection.

THE COURT:      Overruled.

Q.      What -- what happened when you went back? When

I say what happened, did you stay at the hospital, did you get treatment or what? Tell us about that.

A. When I went back to the hospital and I had conversation with, I assume, the receptionist, and what I remember is someone, I don't remember who it was, telling me that I needed to give the medication time to work.

  MR. JACKSON: Objection.

  MR. CURRIDEN: We object.

  THE COURT: Overruled.

Q. I'm sorry. There were some interruptions there. Could you repeat that? Somebody said what?

A. That I needed to give the medication time -- that I needed to go back home and give the medication time to work.

  MR. JACKSON: Objection.

  THE COURT: Mr. Ferguson, I want to say something to the jury.

  MR. FERGUSON: Yes, sir.

The trial court then gave a limiting instruction to the jury, in accord with its ruling on defendants' motion in limine:

  THE COURT: Members of the jury, as I said yesterday, there's no claim or allegation that anyone at the Hospital did anything wrong or negligent regarding this morning visit. Nobody, no nurse, no doctor or physician assistant. So when you get to the point of deciding whether negligence was committed, this has nothing to do with it. Please go ahead, Mr. Ferguson.

Plaintiff then resumed her testimony:

> Q.  So what did you do after this person told you to go back home and give the medication time to work?
>
> A.  I went back home and laid down.
>
> Q.  How did you feel when you got back home?
>
> A.  I laid there for a little while, and I may have made some phone calls or something. I don't quite remember. But after awhile I went back to the hospital. My auntie told me that I needed to go back.

Plaintiff argues that her

> testimony of the details of this visit would have shed light on how sick the Plaintiff was and her efforts to get help as soon as possible. The evidence would have further shown that at the time the Hospital did not take her complaints seriously and demonstrated a reluctance to provide help.

But the testimony plaintiff actually gave showed exactly this – "how sick" she was, "her efforts to get help as soon as possible[,]" and "the Hospital did not take her complaints seriously and demonstrated a reluctance to provide help."

Furthermore, plaintiff made no proffer of additional evidence she contends the trial court should have allowed her to present, so she has not preserved this argument for appellate review. *See generally State v. Reaves*, 196 N.C. App. 683, 687, 676 S.E.2d 74, 77 (2009) ("Likewise, a party objecting to the grant of a motion in limine must attempt to offer the evidence at trial to properly preserve the objection for appellate review.") The only "limitation" or "exclusion" the trial court applied to plaintiff's

testimony about her return visit to the hospital on the morning of 24 February 2010 was to instruct the jury that plaintiff had no claim for medical negligence arising from the alleged conduct of hospital staff from that morning, and, as discussed above, the trial court properly dismissed that claim. The trial court did not abuse its discretion by instructing the jury as to the limitation on the purpose of plaintiff's testimony. This argument is overruled.

VIII. Conclusion

For the foregoing reasons, we affirm.

AFFIRMED.

Chief Judge MCGEE and Judge MURPHY concur.