An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-783

Filed 4 June 2025

Cabarrus County, No. 24JA000042-120

IN THE MATTER OF: L.D.E.

Appeal by Respondent-Mother from an order entered 3 June 2024 by Judge Nathaniel M. Knust in Cabarrus County District Court. Heard in the Court of Appeals on 23 April 2025.

> *Ewing Law Firm, P.C., by Robert W. Ewing, for the Respondent-Appellant Mother.*
>
> *Hartsell & Williams, PA, by Emily J. Arnold, for Cabarrus County Department of Social Services, Petitioner-Appellee.*
>
> *McGuire Woods LLP, by Ami P. Patel, for the Guardian ad Litem.*

WOOD, Judge.

Respondent-Mother ("Mother") appeals from the 3 June 2024 order adjudicating her child, Luke[1] as neglected and dependent. Mother raises two issues

---

[1] Pseudonyms are used to protect the identity of the minor children. *See* N.C. R. App. P. 42(b)(1).

on appeal, (1) the trial court erred by adjudicating the juvenile neglected because the evidence presented at the hearing and in the findings failed to establish Luke was impaired or exposed to a substantial risk of an impairment and (2) the trial court erred by adjudicating Luke as dependent because the findings failed to establish both Mother was unable to provide proper care and supervision for Luke and Mother did not have proper alternative child care arrangements. For the reasons set forth below, we vacate the trial court's orders and remand to the trial court for a new hearing.

## I.    Factual and Procedural Background

Respondent-Mother ("Mother") is the biological mother of Luke, born 12 November 2012. The biological father is unknown and not a party to this appeal.

On 7 January 2024, the Cabarrus County Department of Social Services ("DSS") received a child protective services report ("CPS report") alleging neglect, improper supervision, and substance abuse. The report alleged that Mother left the child home alone until 2 a.m. without a phone while she worked; the child witnessed Mother putting a white powdery substance up her nose; there had been a fire in the home a few months prior while Mother was passed out; Mother was paranoid; and in December 2023 had called 911 four times in a five hour period to report someone had attempted to break in and had cut the power to her house. The following day, 8 January 2024, DSS received a new incident report alleging neglect, physical abuse, improper care, unsafe discipline, and substance abuse. Both reports were filed by the child's maternal Grandmother.

In response to the first report, a DSS social worker met with Mother and Luke on 7 January 2024. During the meeting, Mother admitted a few months prior a candle had caused a fire in her bedroom after she fell asleep. She also admitted to drinking "alcohol and wine and to feeling paranoid regarding someone trying to break into her home." Both Mother and Luke reported that he spends time home alone until the early morning hours. In a follow-up interview, Luke reported to the social worker he was fearful of being left home alone, Mother was "passed out" during the fire in the house, Mother "drinks Red Bull mixed with tequila and vodka every day," and he "witnessed her put a white powdery substance in her nose."

Mother admitted to leaving Luke home alone at night "due to one of her sources of income being food delivery." The social worker reviewed Mother's Ring doorbell camera footage which showed Mother returning home around 1:00 AM on 26 February 2023.

On 5 March 2024, DSS filed a juvenile petition alleging Luke was neglected and dependent contending, among other things, that Mother "has refused to participate in creating a plan for supervision of [Luke]." That same day the trial court entered an order granting nonsecure custody to DSS and placing Luke in the care of Grandmother.

At the nonsecure custody hearing, DSS reported substance abuse and mental health concerns about Mother and requested assessments for both. However, the trial court only ordered Mother to submit a "urine drug screen and/or hair follicle

drug screen" and for legal custody of Luke to remain with DSS. The trial court determined that it was in Luke's best interest to remain in placement with Grandmother and granted Mother supervised visitation for one hour per week.

On 21 March 2024, the trial court held another nonsecure custody hearing which mother attended with her attorney. In the order dated 30 April 2024, the trial court noted that during her first visit with Luke, Mother had to be redirected multiple times because she kept actively discussing the case and raising her voice at Luke. In addition, the trial court found Mother had completed the required drug tests on 12 March 2024. The hair follicle test was positive for cocaine, amphetamines, and THC and the urine test was positive for methamphetamines, amphetamines and THC. DSS attempted to discuss the drug results with Mother, but she refused to discuss them with anyone other than her attorney.

On 25 April 2025 the trial court conducted an adjudication and disposition hearing. During the adjudication phase of the hearing, Officer Adam Culp ("Officer Culp") of the Concord Police Department, Social Worker Byrd, and Grandmother testified while Mother testified during the disposition phase. At the close of State's evidence Mother made a motion to dismiss arguing DSS failed to meet the standard of clear and convincing evidence of either neglect or dependency. In response to Mother's motion to dismiss, DSS stated their main concern was the series of four 911 calls Mother placed on the evening of 16 December 2023 and early hours of 17 December 2023.

In the first call, Mother reported vehicles driving up and down the road, gun shots coming from the vehicles, and their male drivers smiling at her. Officer Culp responded to three of the four calls and testified Mother appeared to be disoriented and confused. Officer Culp observed cars matching the descriptions given parked in the neighborhood and determined they were owned by the neighbors. He spoke with a woman walking her dog about reports of shots fired. Neither she nor the neighbors reported seeing or hearing anything suspicious. Noticing a Ring doorbell camera, Officer Culp asked to see the footage. Mother consented but nothing corroborated Mother's reports. Officer Culp testified he observed Luke and did not have any concerns about Luke's welfare, nor did he think he was in any physical danger at the time. "He . . . appeared calm. . . . [h]e didn't appea[r] malnourished or anything like that . . . ." "He had a home. He was clothed. The home was clean at the time, so I didn't feel like he was in any physical danger."

Approximately thirty minutes after Officer Culp left the scene, Mother called 911 a second time reporting that one of the vehicles reported during her first call, an Audi hatchback, had come back. Officer Culp responded to the second call, verified and relayed to Mother that the Audi hatchback belonged to a neighbor who had just come back from dinner.

In her fourth and final 911 call, Mother reported someone had walked through her backyard, cut her power off, and she believed it was the same people from earlier. Once again Officer Culp responded. He observed no signs of tampering or damage to

the junction box and the home appeared to have power. Through the open front door, Officer Culp observed Mother packing bags and could see Luke was present. He asked Luke how he was doing, and Luke responded by "kind of wav[ing] and nod[ing] and just kept doing what he was . . . doing at the time." Officer Culp asked Mother why she was packing. She stated, "she was going to her mother's home" because "she didn't feel safe . . . at her residence anymore." Officer Culp testified he

> was concerned with her [ability] to drive because . . . her demeanor was similar to that of an impaired person. . . . it [was] concerning for [her, in] the state of mind she was in to be by herself with a child, so I asked if there was anywhere she could go. And she said she had already called her mom and that her mom was going to come to get her.

Officer Culp also testified that he noticed "items that are usually related with paraphernalia, not necessarily paraphernalia on their own[,]" including a tray, rolling papers, and a glass hookah in the home. However, he did not recall smelling marijuana or any alcohol from where he stood at the front door. Mother told him the items belonged to a friend. DSS attempted to enter a copy of Mother's drug screen results as Exhibit 2. Mother objected on the grounds that the drug screen results constituted post-petition evidence, the person who administered the drug screen test was not available for cross-examination, and no one was available to testify whether Mother's legal prescriptions could account for positive drug screens. The trial court sustained the objection, and the evidence was not admitted.

At the end of adjudication phase, the trial court made several oral findings, including that testimony regarding the series of 911 calls was credible. Further, the trial court found Grandmother's testimony credible and corroborative of Officer Culp's concerns that Mother suffered from paranoid delusion, and that "[Mother] has not participated in trying to rectify some of these issues and concerns that the Department has and is not cooperating." Based on these findings the trial court orally concluded that DSS "has met their burden in . . . this case by clear and convincing evidence that this child is dependent and neglected."

Thereafter, the trial court proceeded to the disposition phase of the hearing. Mother testified to her preference that Luke live with her father ("Grandfather") rather than Grandmother because he has been the only person supportive "every step of the way . . . he's been the only support that [she has] had this entire time." At the time of the hearing, Grandfather was in the process of having a placement assessment by DSS.

Mother testified about her concerns with Luke continuing to live with Grandmother. Mother noted Luke has not wanted to do their typical family activities anymore. Mother also testified about her efforts to help her case including that she has obtained a three-bedroom house; visited a drug and rehab center *prior* to the request made by DSS; had a psychological evaluation indicating she was "experiencing situational stress"; and produced five clean drug tests since Luke has been in DSS custody. She also reported she had voluntarily completed forty hours of

group therapy and was starting a twelve-week "family class." However, the "family class" was not defined to the trial court. Mother also testified about her education and upcoming college graduation.

The trial court entered a written order on 3 June 2024 adjudicating the juvenile neglected and dependent and placing him in the continued custody of DSS, maintaining his current placement with Grandmother. Mother filed a timely notice of appeal on 17 June 2024 based on N.C. Gen. Stat. § 7B-1001(a)(3).

## II. Standard of Review

On appeal, this Court "reviews an adjudication of neglect [and dependency] to determine whether the findings of fact are supported by 'clear and convincing evidence,' and whether the trial court's findings support its conclusions of law." *In re A.D.W.*, No. COA24-868, 2025 WL 1118840 at *4 (N.C. App. Apr. 16, 2025); *In re L.C.*, 293 N.C. App. 380, 389, 900 S.E.2d 697, 706 (2024). "Clear and convincing evidence is evidence which should fully convince." *In re K.J.M.*, 288 N.C. App. 332, 338, 886 S.E.2d 589, 594 (2023) (cleaned up). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *In re L.C.*, 293 N.C. App. 380, 389, 900 S.E.2d 697, 706 (2024) (cleaned up). Any "[u]nchallenged findings of fact are binding on appeal." *Id.*

We review a trial court's conclusions of law *de novo*. *In re D.H.*, 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]."

*In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (cleaned up). "The determination that a child is neglected [or dependent] is a conclusion of law we review *de novo*." *In re L.C.*, 293 N.C. App. 380, 389, 900 S.E.2d 697, 706 (2024) (quoting *In re J.C.M.J.C.*, 268 N.C. App. 47, 51, 834 S.E.2d 670, 674 (2019)) (cleaned up).

On review, we not only focus on the impact of the unsupported findings, but also on whether the remaining supported findings are sufficient or not to support the trial courts' adjudications. *In re A.J.*, 386 N.C. 409, 413, 904 S.E.2d 707, 712 (2024). We "disregard any unsupported findings of fact, examine whether the remaining findings are sufficient, and if necessary, examine whether the evidentiary record could support additional findings." *Id.*

## IV. Analysis

As a preliminary matter, we must address pertinent issues with the initial background portion of the trial court's order. We cannot simply disregard this section as it contains the necessary findings for jurisdiction. However, it appears to be a cut and paste of the prior nonsecure custody order and, in fact, makes findings regarding whether there is a factual basis for the allegations in the petition and whether the child should remain in nonsecure custody. Additionally, the first finding of fact states, "[t]he [c]ourt accepts without objection the CCDSS and GAL Reports into evidence and incorporated as this [c]ourt's findings of fact." However, the DSS and GAL court reports may not be "considered by the court prior to the completion of the adjudicatory hearing." N.C. Gen. Stat. § 7B-808(a) (2024) ("No predisposition report

shall be submitted to or considered by the court prior to the completion of the adjudicatory hearing."). There was no motion made to enter the reports into evidence at the hearing. Further, the court reports contained allegations from the 7 January 2024 child protective services report and the 8 January 2024 new incident report, to which Mother made several hearsay objections when the DSS social worker testified to the substance of the court reports.

Generally, "in a bench trial, we presume the trial court ignored any inadmissible evidence unless the defendant can show otherwise." *State v. Lindsay*, 292 N.C. App. 641, 649, 899 S.E.2d 25, 31 (2024). In the instant case, the trial court clearly stated it was incorporating the inadmissible evidence into its order and further relied on such evidence in some of its other findings. Therefore, we are unable to presume the inadmissible evidence was ignored. These reports should not have been incorporated into adjudication findings of fact unless there was separate competent evidence presented to support them. Because there was no separate competent evidence to support them, the trial court erred by incorporating them and we overrule this finding.

Mother asserts two arguments on appeal: (1) the trial court erred by adjudicating Luke as neglected because the evidence presented at the adjudication hearing and the competent findings of fact failed to establish Luke was physically, mental, or emotionally impaired or exposed to a substantial risk of such an impairment, and (2) the trial court erred by adjudicating Luke as dependent because

the evidence failed to establish Mother was unable to provide proper care and supervision for Luke and did not have available to her proper alternative child care arrangements.

### A.    Neglect

Neglect of a juvenile is defined in pertinent part as follows:

> "[a]ny juvenile less than 18 years of age . . .  (ii) whose parent, guardian, custodian, or caretaker does any of the following:
>
> a. Does not provide proper care, supervision, or discipline.
> b. Has abandoned the juvenile . . .
> c. Has not provided or arranged for the provision of necessary medical or remedial care.
> . . .
> e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.
>  . . .

N.C. Gen. Stat. § 7B-101(15) (2024).  To substantiate allegations of neglect there must be clear and convincing evidence of current circumstances that present a risk to the juvenile.  *In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019).  Additionally, there must "be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide 'proper care, supervision, or discipline.' "  *In re G.C.*, 384 N.C. 62, 69, 884 S.E.2d 658, 663 (2023) (cleaned up).

Mother argues findings of fact 1, 4, 6, 9, 10 and 11 in the trial court's order were not supported by clear and convincing evidence and should therefore be

disregarded. Without those findings Mother asserts that no clear and convincing evidence exists to substantiate the allegations of neglect.

### 1.   *Findings of Fact 1 and 6*

Mother argues that findings of fact 1 and 6, which were descriptions of the DSS incident reports from 7 January 2024 and 8 January 2024, both based on the social worker's testimony, were not entered for the truth of the matter asserted and were therefore unsupported as findings. During the social worker's testimony Mother clearly objected to the introduction of the reports and DSS responded "I would agree that it should not be admitted for purposes of proving the truth of the matter asserted, but for the effect on the listener." The trial court then overruled the objection. Our Supreme Court has stated that "out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *In re A.J.L.H.*, 384 N.C. 45, 52, 884 S.E.2d 687, 692 (2023). However, these findings while not erroneous, should be treated as "non-substantive evidentiary findings." *Id.* Therefore, findings of fact 1 and 6 are supported to the extent they indicate why DSS investigated, however they do not in and of themselves support the allegations within the reports.

### 2.   *Finding of Fact 4*

Mother challenges a portion of finding of fact four:

> 4. . . . Officer Culp related to the Mother that it would be in her best interest and her son's best interest to go and stay with [ ] (Maternal Grandmother). . . .

Mother argues this portion of finding of fact four misstates Officer Culp's testimony. We agree. The adjudication hearing transcript does not support the finding that Officer Culp instructed Mother, rather Officer Culp testified that he observed Mother packing and "*she* told *me* that she was going to go to her mother's home" because "she didn't feel safe at her . . .residence anymore." Officer Culp then stated he thought as long as she was arranging a ride, it would be in her best interest to go stay with her mother. Therefore, this portion of finding of fact four is not supported by competent evidence and should be disregarded. *In re M.Y.P.*, 378 N.C. 667, 675, 862 S.E.2d 773, 779 (2021).

### 3. *Finding of Fact 9*

Mother contests two parts of finding of fact nine. First, she argues the portion of the finding stating, "[t]he juvenile at one point, ran into the maternal grandmother's home at 11:00 p.m. and was crying and stated that he never wanted to experience that again" should be disregarded as the trial court improperly ruled this testimony was an excited utterance and "not being offered for the truth of the matter asserted." We agree.

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C. Gen. Stat. § 8C-1, Rule 803(2) (2024). To qualify as an excited utterance, "there must be (1) a sufficiently startling experience suspending reflective

thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985). Here, Grandmother testified this statement took place the evening of the 911 calls. However, Luke's statement was not in response to any of the calls or Mother's activities as they took place. In fact, the officer testified that when he responded to the call Luke "didn't appear stressed or worried or concerned." Most importantly, Luke had significant time for reflection between the time of the 911 calls at Mother's home and the time Mother and Luke arrived at Grandmother's home. Because Luke had time to reflect on the events and the statement was not a spontaneous reaction to the events, the statement cannot be categorized as an excited utterance and introduced as a hearsay exception. N.C. Gen. Stat. § 8C-1, Rule 803(2) (2024). Because Grandmother's testimony was hearsay and no other evidence was provided concerning the statement, the finding is not supported by competent evidence and is disregarded.

Mother's second contention for finding of fact nine regards the finding, "Mother has on multiple occasions driven home from Gaston County drunk." Mother contends there is no testimony to support this finding. We disagree. Grandmother testified that Mother told her "I drive like this all the time. I've driven from Gastonia like this." Mother made no hearsay objection to the statement at the hearing and this testimony provides competent support for the finding. *In re F.G.J.*, 200 N.C. App. 681, 693, 684, S.E.2d 745, 753-54 (2009) (holding when "no objection on hearsay

grounds [is] made . . . the testimony must be considered competent evidence."). Therefore, this portion of finding of fact nine is supported.

    4.  *Finding of Fact 10*

  Mother contests that the statement in finding of fact ten that found, "[Grandmother] ultimately had the mother involuntarily committed due to Mother's repeated concerning behaviors" is inaccurate and unsupported. We agree. This finding was placed in a paragraph describing Mother's behavior on the night of 911 calls and appears to conclude Grandmother had Mother involuntarily committed after that night. This is not supported by the testimony. Grandmother's testimony was the only testimony regarding commitment, and she stated,

> [DSS Attorney]. Okay. How many times has she been involuntarily committed before?
>
> [GRANDMOTHER]. That was my first time attempting to do that as an adult, but when she was younger I took her.
>
> [DSS Attorney]. Was she actually involuntarily committed as an adult, or?
>
> [GRANDMOTHER]. No.

Grandmother's testimony clearly states that Mother was not involuntarily committed in response to the night at issue and has never been involuntarily committed as an adult. Therefore, this finding is unsupported and shall be disregarded. *In re M.Y.P.*, 378 N.C. 667, 675, 862 S.E.2d 773, 779 (2021).

    5.  *Finding of Fact 11*

Finally, Mother challenges a portion of finding of fact eleven which states, "[DSS] repeatedly spoke with mother about . . . lack of follow through in mental health services for [Luke]." Mother contends there is no evidence that she failed to follow through with Luke's mental health services. We agree. The social worker testified Mother was unwilling to engage in a safety plan with DSS; however she also testified that Luke was in therapy prior to being placed in DSS custody. There was no other testimony or evidence presented to support a finding that Mother did not follow through on providing mental health support for Luke when he was in her care. Therefore, this portion of finding of fact eleven is unsupported and disregarded.

In addition to the six previously contested findings of fact, Mother also contends that finding of fact nineteen, which is more accurately identified as conclusions of law that grounds exist for adjudication of neglect, cannot be supported by the remaining findings of fact. We agree.

"Whether a statement is an ultimate fact or a conclusion of law depends upon whether it is reached by natural reasoning or by an application of fixed rules of law." *Woodard v. Mordecai*, 234 N.C. 463, 472, 67 S.E.2d 639, 645 (1951) (citations omitted). Finding of fact nineteen clearly makes conclusions by explicitly stating and applying legal principles such as the statutory requirements of neglect. This Court has previously held that, "[t]he determination of neglect requires the application of the legal principles set forth in . . . [N.C. Gen. Stat.] § 7B-101(15) and is therefore a conclusion of law." *In re K.J.M.*, 288 N.C. App. 332, 339, 886 S.E.2d 589, 595 (2023)

(cleaned up). "[I]f the lower tribunal labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' as a conclusion *de novo*." *In re V.M.*, 273 N.C. App. 294, 298, 848 S.E.2d 530, 534 (2020).

In determining whether evidence exists to support finding nineteen and to adjudicate Luke as neglected, we review the remaining substantive evidentiary findings to determine if they support the conclusions of law. In regard to neglect, the trial court concluded,

> The status of the juvenile has been determined to be *neglected* [ ] in that the juvenile's parent, guardian, custodian or caretaker does not provide proper care, supervision or discipline, the juvenile's parent, guardian, custodian or caretaker has abandoned the juvenile, the juvenile's parent, guardian, custodian or caretaker has not provided or arranged for the provision of necessary medical care, the juvenile's parent, guardian, custodian or caretaker has not provided or arranged for the provision of necessary remedial care, the juvenile's parent, guardian, custodian or caretaker creates or allows to be created a living environment that is injurious to the juvenile's welfare.

The remaining findings of fact fail to support any of these conclusions. Findings two, three, and four summarize the events of 16 December 2023 when Mother made the series of 911 calls. However, none of those findings allege any issues pertaining to Luke let alone evidence of any harm or impairment. Findings of fact five and eight indicate that Mother would sometimes drink alcohol and occasionally leave Luke home alone. It is not illegal for a parent over the age of twenty-one to consume wine on occasion. Additionally, leaving an eleven-year-old at home alone is not, in and of

itself, illegal and certainly does not rise to the level of abandonment. In fact, in North Carolina, the American Red Cross provides babysitting service training to children eleven-years-old and older. If a child is old enough to provide babysitting services to others, it would stand to reason they are old enough to spend time home alone.[2] This, of course, depends on the maturity and development of each individual child. No evidence was presented suggesting Luke was not mature enough to be home alone for limited periods of time.

Findings of fact seven, eight and eleven describe Mother's refusal to cooperate with DSS. However, there is no requirement that Mother must comply with DSS' recommendations prior to a court order and her unwillingness to voluntarily comply cannot be used against her in these adjudication proceedings. *In re E.B.*, 375 N.C. 310, 324, 847 S.E.2d 666, 676 (2020) (discussing a parent's voluntary involvement with DSS prior to a court order cannot be used against them to support grounds for termination). Further, it is not enough that Mother "frustrated [DSS'] ability to gather evidence" because "misconduct is insufficient to allow a conclusion that [Luke] did not receive proper care or lived in an injurious environment." *In re J.C.M.J.C.*, 268 N.C. App. 47, 60, 834 S.E.2d 670, 679 (2019).

---

[2] American Red Cross, *Babysitting Training in North Carolina*, https://www.redcross.org/local/north-carolina/take-a-class/babysitting?srsltid=AfmBOopp4GhtZvk_m401TsLv9BfPEIf5oXgxWUeXIk2TWv28y8XWyc91 (last visited May 16, 2025).

Findings of fact nine and ten outline Grandmother's concerns with Mother's mental health and behavior. However, none of the incidents describe any involvement or risk to Luke. In fact, finding of fact nine explicitly states that during the incident of Mother's inebriation at TGI Friday's Luke was at summer camp.

Based on these remaining findings there is no support for the contention that there has been "some physical, mental, or emotional impairment" of Luke or that there is "substantial risk of such impairment" because of the failure to provide proper care, supervision, or discipline as required. *In re H.P.*, 278 N.C. App. 195, 207, 862 S.E.2d 858, 868 (2021). While "[t]here is no requirement of a specific written finding of a substantial risk of impairment . . . the trial court must make written findings of fact sufficient to support its conclusion of law of neglect." *In re G.C.*, 384 N.C. 62, 69, 884 S.E.2d 658, 663 (2023). Here, notwithstanding GAL's assertion that "[i]t is well-established that the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home," no substantial risk of harm to Luke is demonstrated by the remaining supported findings. *In re T.S., III*, 178 N.C. App. 110, 113, 631 S.E.2d 19, 22 (2006). While the findings outline concerns for Mother's mental health and her risk of being charged for misuse of 911, they fail to prove how these mental health concerns have impacted Luke or created a substantial risk to Luke necessary to adjudicate him neglected. "In adjudicating a child neglected, 'the circumstances and conditions surrounding the child,' not 'the fault or culpability of the parent,' are 'what matters.'" *In re R.B.*, 280 N.C. App. 424,

432, 868 S.E.2d 119, 125 (2021) (cleaned up).

The trial court made no findings that Luke lives in an environment injurious to his welfare. There is no evidence to show current circumstances present a risk to Luke. *In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019). For all findings regarding Mother's concerning behaviors, apart from the 911 call evening, testimony indicates Luke was not present, thus neither did he witness nor was he endangered at these times. Significantly, on the evening of the 911 calls, Mother demonstrated she had a safety plan in place when she arranged for Luke to be with Grandmother once she no longer felt safe in her home.

Because the trial court failed to make sufficient findings of fact in support of the conclusion of law to adjudicate Luke as neglected, we vacate the trial court's adjudication of neglect and remand for further findings of fact as to whether evidence exists from which the adjudication could be supported. *In re L.B.*, __ N.C. App. __, __, 909 S.E.2d 711, 717 (2024).

**B. Dependency**

Mother argues, just like finding of fact nineteen was actually a conclusion of law concerning neglect, similarly finding of fact twelve a conclusion of law regarding dependency. Finding twelve states,

> Mother does not have an appropriate care plan for the juvenile. Mother has not taken protective action to care for the juvenile or provide a care plan for the juvenile; has abdicated her parental duties as to the juvenile; and refused to perform the natural and legal obligations of

parental care and support.

As explained supra when a finding requires the "application of fixed rules of law" it is more accurately a conclusion of law and therefore reviewed *de novo* and must be supported by the remaining findings of fact. *Woodard v. Mordecai*, 234 N.C. 463, 472, 67 S.E.2d 639, 645 (1951); *In re V.M.*, 273 N.C. App. 294, 298, 848 S.E.2d 530, 534 (2020). Finding of fact twelve clearly requires the application of law in determining a parent's legal obligation of care and is therefore a conclusion of law that must be supported by the findings. Mother contends the remaining substantive evidentiary findings cannot support the conclusion that Luke is dependent. We agree.

A dependent juvenile is defined as "[a] juvenile in need of assistance or placement because . . . the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2024). "An adjudication of dependency requires the trial court to 'address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements.'" *In re H.P.*, 278 N.C. App. 195, 207, 862 S.E.2d 858, 868-69 (2021) (quoting *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005)). "Findings that a parent is unable to care for her children and that the parent lacks an alternative child care arrangement support a dependency adjudication." *In re of A.J.*, 386 N.C. 409, 416, 904 S.E.2d 707, 714 (2024). "Findings of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the

court's failure to make these findings will result in reversal of the court." *In re H.P.*, 278 N.C. App. 195, 207, 862 S.E.2d 858, 869 (2021); *In re L.C.*, 253 N.C. App. 67, 80, 800 S.E.2d 82, 91-92 (2017.

Here, the findings do not denote Mother's inability to provide care or supervision for her minor child. Rather, they point to a few specific instances of concerning behaviors by Mother, all which fail to show Luke was harmed, at a substantial risk of harm, or even that he was present. There is no evidence or reasoning as to how the court concluded that Mother was not caring for Luke aside from Mother's refusal to work with DSS to create an official safety plan. There is no requirement, however, that Mother must comply with DSS' recommendations prior to a court order and her unwillingness to voluntarily comply cannot be used against her in these adjudication proceedings. *See In re E.B.*, 375 N.C. 310, 324, 847 S.E.2d 666, 676 (2020). Rather, ample competent evidence was presented that while Mother had some mental health concerns, Luke lived in a safe home, was clean, clothed and well fed, attended school and therapy and Mother effectively and purposely relied on Grandmother when she had moments of struggle.

Additionally, the evidence and testimony at trial clearly support the contention that Mother had appropriate alternative childcare arrangements prior to intervention by DSS. It has been "consistently held that in order for a parent to have an appropriate alternative childcare arrangement, the parent must have taken some action to identify viable alternatives." *In re C.B.*, 245 N.C. App. 197, 211, 783 S.E.2d

206, 216 (2016). Additionally, the alternative care provider must be willing and able to provide care. *In re D.J.D.*, 171 N.C. App. 230, 239, 615 S.E.2d 26, 32 (2005).

Grandmother testified that she regularly helped care for Luke and that Mother brought Luke to her on the night of the 911 calls incident. The officer testified that Mother decided to take Luke to Grandmother when she was scared and not doing well. In finding of fact ten the trial court found that "the juvenile remained in the home with the maternal grandmother since that night" clearly indicating Mother made the choice to leave Luke with Grandmother as needed. It is uncontroverted that Mother was consistently utilizing Grandmother as an alternative childcare provider prior to any DSS involvement and DSS determined her to be a viable provider as the trial court found "[Luke] is doing well in his placement with his maternal grandmother and currently [DSS] does not plan on moving him." Findings four, nine, and ten all provide information about Grandmother's involvement caring for Luke prior to DSS involvement and finding of fact sixteen evidences DSS' approval and continued reliance on Grandmother. Further, finding of fact seventeen notes Mother also requested that her father, Grandfather, be considered as an alternative, he agreed and was in the process of being assessed by DSS. There are no findings or evidence in the record to support the conclusion that Mother lacked alternative childcare arrangements.

Because the trial court failed to make sufficient findings of fact in support of the conclusion of law to adjudicate Luke as dependent, we vacate the trial court's

adjudication of dependency.

## V.    Conclusion

For the foregoing reasons, we vacate the adjudication order finding the juvenile to be a neglected and dependent juvenile.  As we have vacated the adjudication, we must also vacate the resulting disposition.  *In re S.C.R.*, 217 N.C. App. 166, 170, 718 S.E.2d 709, 713 (2011).  We remand this matter to the trial court for further findings of fact as to whether evidence exists from which the adjudication could be supported or, in the absence of such evidence, for dismissal of the petition.  *In re L.B.*, __ N.C. App. __, __, 909 S.E.2d 711, 717 (2024).


VACATED AND REMANDED.

Chief Judge DILLON concurs by separate opinion.

Judge STADING concurs in result only.

Report per Rule 30(e).

No. 24-783 — *In re L.D.E.*


DILLON, Chief Judge concurring.


I concur in the majority opinion. Our General Assembly has provided that "[w]here a juvenile is alleged to be abused, neglected, or dependent, the rules of evidence in civil cases shall apply." N.C.G.S. § 7B-804. In its order, the trial court states that it "accepts without objection the CCDSS and GAL Reports into evidence and incorporated as this [c]ourt's findings of fact." The trial court then makes several findings, as outlined in the majority opinion, that are based on information in those Reports. However, the record clearly shows that those Reports were not allowed into evidence as substantive evidence of the information contained therein. And the witnesses who had firsthand knowledge of the matters therein did not testify regarding those matters.

The trial court did appropriately make findings showing Mother's paranoid and potentially dangerous behavior through the testimonies of the witnesses who testified at the hearing with firsthand knowledge. But there was also evidence of other potentially dangerous behavior by Mother in which the trial court made no finding. For instance, as stated in the majority, Grandmother testified Mother admitted to routinely driving her car in an impaired condition, which is *some* evidence, when coupled with evidence of Mother's episodes of paranoid behavior, of potential risk of harm to Luke. Therefore, I agree the appropriate mandate is for Order to be vacated and the matter be remanded to properly reconsider the matter.